No. 35,068

GEORGE M. BULL, *Appellee*, v. THE S. PATTI CONSTRUCTION COMPANY, and THE EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY, *Appellants*.

(106 P. 2d 690)

Opinion filed November 9, 1940.

*Blake A. Williamson, James K. Cubbison* and *Lee Vaughan, Jr.,* all of Kansas City, for the appellants.

*A. M. Etchen,* of Kansas City, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was a workmen's compensation case. Claimant prevailed, and the employer and insurance carrier appeal. Appellants contend there was no substantial evidence to support the finding a written claim was made as required by law or to support the award of the district court.

Touching the first alleged error, appellants stoutly maintain the written claim for compensation was not made by the injured workman, George M. Bull, personally, and hence did not constitute a valid claim. The signature to the claim was—"George M. Bull, by A. M. Etchen, his attorney." On the dates the claim was signed and filed, claimant was an inmate of a penal institution in Milan, Mich. Claimant's wife consulted with A. M. Etchen. According to the record counsel for claimant testified:

"I think Mrs. Bull came to see me possibly a few days before that date (*i. e.*, of the written claim dated October 26, 1939). I don't know whether I have a written contract (of employment) or not. He was not there at the time and she came to me there and had me do this—that is, she consulted with me and I advised her to do that and so she authorized me to go ahead and do it. I'm not sure Mr. Bull ever authorized me to send that letter in his behalf.

"I think he wrote me a letter, I'm not sure, or wrote her a letter to that effect. I don't think I have that letter, and I don't have a copy of a contract."

Claimant was present at the hearing. The record, touching authorization to act for him, reads:

"Q. Mr. Bull, did you authorize Mr. Etchen as your attorney to write correspondence or serve a notice upon the Patti Construction Company about your accident? A. Did I write him?

"Q. Yes? A. I, told my wife to go ahead with it. I wrote to my wife and told her to go ahead with it—I don't remember when it was. Maybe September or October. I told her if I had anything coming to try to get it. Some words of that sort."

Appellants contend G. S. 1939 Supp., 44-520a, and the decisions of this court, make it mandatory the claim be made personally by the workman except in one instance mentioned in G. S. 1939 Supp., 44-509, which extends the right to a guardian to make the claim in the event of mental incompetency of the workman or a dependent of the workman. It is true the latter statute authorizes the guardian to make the claim in the event of mental incompetency and when the dependent is a minor. Does it, however, follow that during the mental competency of the workman, he must personally sign the

claim and that he can in no event authorize an attorney to act in his behalf? We have no decision squarely in point. The answer must be found in the statute. The pertinent portion of section 3, chapter 213, Laws 1939, reads:

"No proceedings for compensation shall be maintainable hereunder unless a written claim for compensation shall be served upon the employer by delivering such written claim to him or to his duly authorized agent, or by delivering such written claim to him by registered mail within one hundred twenty days after the accident, . . ." (G. S. 1939 Supp., 44-520a.)

The only change in the 1939 act is that time for making claim was thereby extended from 90 days to 120 days. It will be observed the statute does not provide the claim must be made personally by the workman. It merely provided "no proceedings for conpensation shall be maintainable hereunder unless a written claim for compensation shall be served," etc. The statute, however, does specify upon whom the claim shall be served by specifically naming the employer or his duly authorized agent. The purpose of that provision and the requirement that it be made within a specified time is . obvious. That purpose was to give notice of the claim to the employer and to give it within such time as would enable the employer to make the necessary investigation of the alleged injury for his own protection. The statute also specifies the exact manner in which the claim shall be made when not made by personal delivery to the employer or his duly authorized agent. When not so made it permits delivery of claim by registered mail. The latter provision relative to service by registered mail was enacted in order to eliminate endless confusion, uncertainty and conflict as to whether claim actually had been made by mail and to eliminate numerous questions of waiver of claim. (*Klein v. McCullough,* 135 Kan. 593, 597, 11 P. 2d 983.) True, it has been held express statutory requirements as to time and the manner of making claim upon the employer or his duly authorized agent are preliminary to the right of recovery, and are therefore imperative. A few of the decisions, cited by appellants, which state the principle and discuss the reasons therefor, are: *Klein v. McCullough,* supra; *Suttle v. Marble Produce Co.,* 140 Kan. 13, 16, 34 P. 2d 116; *Flanagan v. Lux,* 141 Kan. 88, 92, 40 P. 2d 458; *Graham v. Pomeroy,* 143 Kan. 974, 975, 57 P. 2d 19. These decisions are not directly in point and do not support appellants' contention. We find nothing in the statute or in our decisions which, in words or principle, militate against the right of an injured workman to authorize an attorney to file a claim in his behalf.

Appellants quote from the Flanagan case, *supra,* as follows:

"The injured party is generally referred to in the compensation act as the claimant, and, as the word indicates, he is naturally the one expected to make the claim, although that part of the statute above quoted does not so state, but in the concluding part of said section it is specifically stated that if the claimant has been under disability, the time shall not begin to run until the removal of such disability." (p. 91.)

In the Flanagan case it was held a letter written by the compensation commissioner, at the request of claimant's doctor, to the contractor to obtain for the doctor the report of the accident and to ascertain the name and address of the insurance carrier in order that the doctor might communicate with the insurance carrier concerning the question of medical expenses, did not constitute a written claim of the workman for compensation. The letter by the doctor was written without the knowledge or consent of the injured workman. In the instant case claimant testified: "I told her (his wife) if I had anything coming to try to get it." Clearly that unqualified instruction vested his wife with full authority, including the right to select a lawyer of her own choice for her husband, to effect the desired result. We think there was nothing lacking in the authority of the wife or the attorney to make the claim. True, as stated in the Flanagan case, the workman is naturally the one expected to make the claim, but can it accurately be said the workman did not make the claim when another, and especially a lawyer whose business it is to represent his client, was vested with full authority to make the claim for him? We think not. In the instant case nothing which we can discern prevented the claim from being sent to the workman for his own signature. It would be a far better practice, when at all possible, to have the workman sign his claim in person. Such a practice would eliminate all question concerning the desire of the workman to claim compensation. It would also eliminate all question on the subject of authorization of another to claim it for him. In the absence, however, of a clear statutory requirement that the claim be signed by the workman, we cannot say it was the intention of the lawmakers to make his personal signature mandatory.

Appellants insist this court has definitely held strict compliance with steps preliminary to the right of recovery is imperative, and that as to such preliminary steps the rule of liberal construction does not apply in compensation cases. (*Suttle v. Marble Produce Co.,* 140 Kan. 13, 16, 34 P. 2d 116.) It is true we have held claimant

must strictly comply with the express statutory provision as to the time within which the claim must be made, and that he must strictly comply with the express statutory requirement of claim by registered mail when he relies upon claim by mail. When we so held we were, however, only giving effect to a clear, express legislative mandate which made strict compliance with those preliminary steps imperative as a precedent to the right of recovery. Governing the instant case we find no such clear expression of legislative intent. Moreover, so far as the merits of this case are concerned, appellants were in nowise prejudiced. It was stipulated appellants had notice of the injury, and there is not the slightest indication the written claim did not serve its intended purpose or that appellants were in any wise handicapped thereby in making the necessary investigation for their own protection. It is elementary in this state that where provisions of the compensation law permit of informal compliance they have always received a liberal construction to the end that the rights of the parties may be fairly protected. (*Weaver v. Shanklin Walnut Co.*, 131 Kan. 771, 293 Pac. 950; *Eckl v. Sinclair Refining Co.*, 133 Kan. 285, 299 Pac. 588; *Klein v. McCullough*, 135 Kan. 593, 11 P. 2d 983; *Suttle v. Marble Produce Co.*, supra.) We think the instant claim was within the requirements of the statute.

The second contention is the award of the district court was not supported by substantial evidence. The findings of the trial court were:

"The court further finds that said claimant's injury consisted in a comminuted fracture of the shaft of the proximal joint of his right great toe; that claimant sustained twenty (20) compensable weeks (excluding first week) temporary total disability, which was followed by ten (10) weeks 25 percent partial disability, which was followed by (10) percent partial permanent disability; that claimant is entitled to compensation as follows:

"Twenty (20) weeks (not counting first week) temporary total disability, at $18 per week, being 60 percent of average weekly wage of $34 per week, $360.

"10 weeks, twenty-five percent partial being 25 percent of 10 weeks or 2½ weeks, at $18 per week, $45; total, $405."

It will be observed no compensation was allowed for the last finding of ten percent partial permanent disability. The injury consisted of a comminuted fracture of the shaft of the proximal bone, midway back of the joint of the great toe on the right foot. Thirty weeks is the maximum period under the schedule for loss of a great toe or for the permanent loss of its use (G. S. 1939 Supp., 44-510 [7] [19]). The compensation for that period is sixty percent of the

average weekly wages. That wage was $34. It is conceded that since the first two findings of twenty weeks and ten weeks disability exhausted the thirty weeks allowable under the schedule, the last finding of ten percent partial disability was properly excluded from computation of the instant award. The question then is, Can the award be sustained on the basis of twenty weeks temporary total disability and for ten weeks, twenty-five percent partial disability?

The pertinent testimony of the workman, appellee, was in sub-stance as follows: When he was in the employ of appellant, S. Patti Construction Company, on July 19, 1939, as a common laborer he sustained the injury while working at a food terminal in Kansas City, Kan. A two-by-four, about sixteen feet long, used by a fellow-employee, was dropped on his right great toe. Dr. H. L. Regier, at Kansas City, X rayed his toe and treated it two or three times. Doctor Regier told him the toe was broken in five places. Claimant was arrested by federal authorities on July 28, 1939. At the beginning of the hearing, June 24, 1940 (approximately eleven months after the injury), the toe was still swollen and claimant continued to suffer pain. He could not at that time walk the way he did before the injury. He continued to walk somewhat on the side of his foot. He was unable to spring his weight on the toe very well by reason of pain. The pain was practically continuous. The pain was located back of the joint and up into his foot to about the instep. He was taken to a Topeka jail by federal authorities, where he remained seven or eight days. He received treatments while in Topeka. He was then taken to El Reno, Okla., where he remained until October 1, 1939. From there he was taken to a correctional institution at Milan, Mich., where he remained until May 2, 1940. At El Reno he did janitor work in a cell house after a quarantine period of thirty-six days. His work at El Reno required him to be on his feet about two hours per day except on certain days when there was more work. He was relieved, by reason of his injury, of military exercises at El Reno which involved his toe, but he took arm exercises. At Milan, Mich., he worked in a bed factory. The work consisted of taking head frames from a paint rack and hang-ing them on a rack and helping push them into an oven. That work covered the period from October 1 to May, 1940, except for one week during which he worked on the farm. At Milan he put in approximately eight hours per day. The first week he was outside and was on his feet more than the rest of the time. While at Milan,

during the first week, he worked putting in a culvert and covered the culvert with dirt. He had difficulty walking by reason of the tenderness in his toe. At first he was obliged to get off of his foot altogether by reason of pain. He frequently rested his right foot by putting the weight on his left foot. He did not ask for lighter work. He did all the work assigned him except the exercises. While at Milan, Mich., he was on his feet anywhere from one-third to a half day out of every eight hours. The toe did not hurt him sufficiently to prevent his walking on it, but the pain continued and probably would continue the rest of his life. He could walk on it quite a distance, but it bothered him. The toe was not examined or treated at Milan. Concerning the comparison of the nature of his regular work with the work he did at Milan, and the physical conditions under which he performed the work, he testified: "The work I did up there was not as hard work as I do by nine-tenths. . . . I'll say three-fourths. I was not required to be on my feet all the time and I protected my injured foot to a big extent. It pained me practically all the time. There are times when it is worse than others. . . . I haven't done any work except what I have related until the 25th of May, 1940, when I started on construction work again. . . . I am performing labor now that I used to do, i. e., since the 28th of May."

Dr. Willis H. McKean, called as a witness by appellee, testified in substance: He examined claimant June 28, 1940 (the hearing commenced June 24 and was continued to July 1, 1940); claimant complained of pain in the great toe, stating he was injured July 19, 1939. Claimant finished the day's work on July 19 by doing lighter work. The toe was X rayed July 22, bandaged and taped. Claimant saw Doctor Regier on three occasions and was cared for by a government doctor at Topeka and at El Reno, Okla. His examination was limited to his big toe. The toe was swollen at the distal phalangeal joint. In his opinion claimant on June 28, 1940, had a permanent partial disability of between ten and fifteen percent. There probably will be some improvement in time. There is going to be a partial permanent ankylosis in the joint. He did not take X rays. The swelling was only at the distal phalangeal joint and is probably permanent, due to an overproduction of bone at the fractural situs. There was no necrosis, or shortening. He had treated many patients with injuries of this character, but had never seen any who could not get around some. The usual healing

period for a comminuted fracture of the large toe is from three to four weeks. At the end of that period the patient is usually able to return to regular work. We splint the toe for three or four weeks. The patient had a scar over the anterior aspect of the toe and according to the history of the patient the scar was received when he was a child by being struck with an ax. Outside of the scar he found no abnormality on the foot. Four weeks is the average run of disability. Where a fractured great toe was still swollen after a year he thought the injury would take it out of the ordinary case. The continued swollen condition would interfere with walking. The partial ankylosis of the toe would interfere with the motion of the foot during walking. The presence of pain does not necessarily result in inability to work. A man is able to work with pain. He would not say the percent of disability was limited to ten to fifteen percent six months ago. From the history of the case and from the hard swelling present on June 28, 1940, he thought claimant undoubtedly had a fracture in that particular joint. At the present time the partial ankylosis was the cause of his disability.

Dr. H. L. Regier, called as a witness by respondent, testified in substance: He first saw appellee at three o'clock p. m., July 19, 1939. He was then suffering from a comminuted fracture of the shaft of the proximal bone. There was no joint involvement. The fracture was about midway back of the joint. The scar on top of the toe, extending into the foot, was healed and had nothing to do with the accident. That scar, according to the history obtained from claimant, was the result of an injury from an ax while he was a child. The patient made four visits to his office. When he last saw him on July 27, he made a prognosis which was that he had a ten percent stiffness of the distal joint of his large toe. There was then no loss of function in the toe at that joint. He couldn't see any disability. All he could then see was ten percent stiffness and the joint could be worked almost normally by working it. He, at that time, anticipated about two or three weeks' future disability, at the end of which period he expected he would be able to resume his work. It was his experience in cases of comminuted fractures of the great toe, where there is no displacement, that this would be the duration of his disability. The fragments were in perfect condition. He next saw appellee June 26, 1940. On the latter date he found the toe in perfectly normal condition except that there was a ten percent disability in movement of the distal joint. The X ray

revealed the fracture had healed completely, there was no angulation, necrosis, no shortening, and there was a good union. The swelling was in the tissues above and below the joint. If the joint is inflammatory there would be some pain. A rheumatic joint will cause pain. The shaft of the toe was fractured in two or three places, perhaps four. Where there is swelling after a year it shows a pathological condition is present, but it would be difficult to say what caused it. On June 26, 1940, he had about ten percent disability in the toe, caused by stiffness of the distal joint. The injury was between the distal and proximal joints. The swelling is from the tissues around the bone. At the time he first examined him he had a total loss of his toe. That condition continued for four weeks, which is the period he usually allowed. If the toe was swollen and remained so for months and months, he would still say that four weeks would be the duration of the disability. He would not expect pain after a year as a result of a fracture or injury of the bone. His opinion was based upon a practice of thirty years. He based his opinion of disability on the general run of cases. He struck an average.

Appellants state their contention as follows:

"An examination of the two physicians' testimony limits, at the best, the extent of claimant's toe disability to not to exceed four weeks temporary total disability and 10 to 15 percent permanent partial disability. There was no evidence, by any of the witnesses, of any temporary partial (and especially as to 25 percent temporary partial disability) disability to the toe, that would support the district court's finding of 10 weeks of 25 percent temporary partial disability."

It will be observed no contention is made that compensation for each of the two types of disability was not properly computed. The question of computation of compensation is, therefore, not before us. (For proper method of computing compensation for types of disability found in the instant case and other types of disability under the schedule, see *Hering v. San Ore Construction Co.*, 130 Kan. 70, 285 Pac. 592; *Orendoc v. Kaw Steel Construction Co.*, 131 Kan. 366, 291 Pac. 952; *Gallagher v. Menges & Mange Const. Co.*, 146 Kan. 506, 509, 72 P. 2d 79.) The sole question is whether the evidence supports the findings concerning the two types of disability covered by the award.

We shall first consider the finding claimant suffered a total temporary disability of twenty weeks' duration. He did not lose the great toe, but that he lost some of its use immediately following

the accident must be, and is, conceded. He continued to have ten to fifteen percent permanent disability approximately eleven months after the accident. This was a scheduled injury. The mere fact he did some work did not deprive him of scheduled compensation for the loss of the use of his toe. (*Sauvain v. Battelle,* 100 Kan. 468, 164 Pac. 1086; *Raffaghelle v. Russell,* 103 Kan. 849, 176 Pac. 640; *Gallagher v. Menges & Manga Const. Co.,* 146 Kan. 506, 508, 72 P. 2d 79.) It is common knowledge, and indeed there is no evidence to the contrary, that a person might suffer a total loss of a great toe and yet be able to work. Likewise he might lose entirely the use of the toe and be able to work. There is no evidence a person could not do the work appellee did although he had suffered a total loss of the use of the toe. In the Gallagher case, *supra,* we said:

"For aught the record discloses, claimant might have operated the wire-cutter with his right hand and performed his work, in a fashion, although his left index finger had been entirely useless or amputated. The fact he worked did not deprive him of scheduled compensation for the loss of the use of a finger, if he in fact lost such use." (p. 508.)

The fact he did some work, therefore, does not constitute proof he did not totally lose the use of his toe for some period of time. What was the duration of its total disability? The answer is not free from difficulty. The medical testimony has been narrated and need not be repeated at length. It is sufficient to say there was medical testimony this was not the ordinary case of a comminuted fracture of the shaft of the toe in which cases total disability, according to the medical testimony, continues only four weeks. The toe was still swollen and painful approximately eleven months after the injury. That fact was supported not only by the testimony of appellee, but also by the testimony of one physician. The testimony of the other physician also conceded the swelling had not entirely subsided approximately eleven months after the injury. Moreover, the findings as to duration of disability need not rest solely upon medical testimony. In this state, unlike some states, it is not essential that duration of disability or incapacity be established by medical testimony (*Cowan v. Kerford Quarry Co.,* 146 Kan. 682, 72 P. 2d 999; *Hardwell v. St. Louis S. & R. Co.,* 146 Kan. 870, 876, 73 P. 2d 1120.) There was evidence appellee "could not have made a hand" in less than six months. We must, and do assume, in the absence of any further elucidation of this statement that appellee intended thereby

to say he was totally disabled to do his regular hard manual labor, construction work, for a period of six months from the date of the injury. That was evidence of temporary total disability for a period of one-half year or twenty-six weeks. There was also testimony that the work appellee actually did at Milan, Mich., was not as hard as his regular construction work by nine-tenths or three-fourths. He was at Milan until May 2, 1940, a period of approximately nine and one-half months after the injury. At the hearing, approximately eleven months after the injury, he continued to suffer permanent partial disability of ten to fifteen percent. The trial court did not find temporary total disability for six months, or twenty-six weeks, but only for twenty weeks. While it is exceedingly difficult to measure the duration of disability or incapacity as to the use of a toe with absolute accuracy, we cannot say there was no substantial evidence to support the finding of twenty weeks' total disability. It is elementary that in determining the correctness of findings this court is concerned only with evidence which supports or reasonably tends to support the findings, and not with evidence which tends to, or in fact does, overthrow them. (*Gallagher v. Menges & Mange Const. Co.*, 146 Kan. 506, 72 P. 2d 79.)

What about the second finding of ten weeks' temporary partial disability of twenty-five percent? As previously stated, there was evidence of twenty-six weeks' total disability. The trial court found that disability continued only twenty-one weeks. The first week was, of course, deducted in accordance with the requirements of the statute. Thirty weeks constitutes the maximum period of compensation for the loss of a great toe or for loss of its use. (G. S. 1939, Supp., 44-510 [7] [19]). The trial court found twenty-five percent disability or incapacity in the use of the toe during the next ten weeks which was the remaining period of thirty weeks provided by the schedule. There was evidence appellee was not on his feet while performing the work at Milan, Mich., anywhere from one-third to one-half of an eight-hour day. He therefore did not use the toe from fifty percent to sixty-six and two-thirds percent of the day, and the work he was then doing was from nine-tenths to three-fourths lighter than his regular construction work. We think it cannot be said the finding of twenty-five percent temporary partial disability was unsupported by the evidence.

The total amount of the award is supported by the record upon another theory. The second finding of ten weeks' twenty-five per-

cent partial disability is equivalent, as indicated by that finding, to only two and one-half weeks of total disability. Findings one and two on that basis amount to only twenty-three and one-half weeks' total disability, including the first week not computed in the award. That is one and one-half weeks less than twenty-six weeks' total disability testified to by appellee. It follows appellants are not prejudiced by the detailed findings.

The judgment is affirmed.