No. 38,355

JAMES K. POLSTON, *Appellee*, v. READY MADE HOMES, INC.,
and WEST AMERICAN INSURANCE COMPANY, *Appellants*.

(232 P. 2d 446)

Opinion filed June 9, 1951.

*Paul L. Wilbert*, of Pittsburg, argued the cause, and *A. B. Keller, C. A. Burnett*, and *Randall D. Palmer*, all of Pittsburg, were with him on the briefs for the appellants.

*Sylvan Bruner* and *Morris Matuska*, both of Pittsburg, argued the cause, and *Pete Farabi*, of Pittsburg, was with them on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was a workmen's compensation case. The claimant, James K. Polston, had been employed as a carpenter for about three years by the respondent, Ready Made Homes, Inc., which was building residences in and near Pittsburg, Kansas. He was 58 years of age. On the 28th day of September, 1949, he was laying oak flooring when a nail glanced off his hammer and struck his left eye. Before the examiner of the workmen's compensation commission the parties stipulated that the relationship of employer and workman existed at the time of the alleged accident, September 28, 1949; that the parties were governed by the Kansas workmen's compensation act; that the claimant's average weekly wage was $70; that respondent had actual knowledge of the accident within ten days; that written claim for compensation had been made as required by law; that the claimant met with an accidental injury which arose out of and in the course of his employment; that respondent had furnished and paid for medical service in a sum stated, and that claimant had been paid weekly compensation for 34 weeks

at $20 per week. It was further stipulated that the issues are: (1) Nature and extent of claimant's disability, if any, and (2) the amount of compensation due, if any.

The claimant testified about the injury to his left eye and stated that he had only enough vision in the left eye to distinguish daylight from darkness. He further testified that when he was about twelve years old he got some powder in his right eye; that a tube blew out of an old muzzle loading shot gun and the powder came into his face and right eye. He testified that when he was examined for work in Tulsa, Oklahoma, in 1941 or 1942, and the examiner blocked his left eye, he could not read as well with his right eye. A year or two before the injury to his left eye he was shooting a rifle and discovered that when shooting righthanded he could not see through the sights very well, but when he put the rifle over and shot lefthanded he could see through the sights. Through the years up until the injury to his left eye he had not noticed very much the injury to his right eye. He had worked at carpenter work and had driven a truck before he was employed by respondent and had no difficulty in seeing how to do his work; that since the injury to his left eye he had been unable to see enough with his right eye to perform any work. At the hearing before the examiner for the workmen's compensation commission counsel for claimant made it clear that he was claiming the claimant is totally and permanently disabled. The examiner thought that claim might involve the second injury fund (G. S. 1949, 44-566 to 44-572), although claimant's attorney was not limiting his claim to that fund, but relied also on G. S. 1949, 44-510 (3) (24). In view of the claimant's theory that he is totally and permanently disabled the examiner thought it best to contact the compensation commissioner to see if he desired a further record made, and a continuance was had for the hearing of medical evidence. The workmen's compensation commissioner appointed Dr. Earl E. Miller, a physician of Pittsburg, Kansas, specializing in the treatment of eye, ear, nose and throat, to make an examination of the claimant. At a further hearing it was stipulated that his written report might be offered in evidence, the parties waiving an oral examination and cross examination of the doctor. The pertinent part of his report reads:

"He does not wear glasses and the vision uncorrected is 20/100 plus 3 in the right eye and less than 20/200 in the left eye, which amounts to a loss of visual efficiency of about 45% in the right eye and about 85% in the left eye.

He has central immature cataracts, worse in the left eye. Glasses do not seem to improve his vision because of the cataracts. Surgery may be of help at a later date."

The claimant had been examined on two occasions by Desmond Curran, M. D. of Kansas City, Missouri. The pertinent part of the first report reads:

"The above patient was first seen by us on November 4, 1949. He gave a history of being struck in the left eye with a nail six weeks prior to that time. The vision in his left eye had been bad since the above accident. There was considerable watering of the left eye due to a corneal scar which is linear and in the region of about ten o'clock.

"The right eye had multiple areas of cloudy cornea with some powder impregnation which was evidently due to an old powder burn of the right eye at the age of fourteen.

"A posterior capsular cataract is present in each eye and our studies with the corneal microscope are convincing enough to say that they existed prior to the above accident and this visual impairment is due to the corneal scar and also to the fact that the eye is healing and the vision is not as good as it will be when the healing is completed."

The second report of Doctor Curran reads:

"The last examination of the above named patient was on March 29, 1950. The vision in his right eye was 20/100 and in his left eye the vision was 20/200.

"The left cataract appears to be larger than when he was examined in November 1949. The vision has decreased in the left eye.

"I believe this cataract could be removed successfully in the near future."

The examiner for the commissioner concluded that the claimant is not totally and permanently disabled and therefore not entitled to benefits under the second injury fund. He found that the claimant was entitled to compensation for the loss of an eye for a period of 110 weeks (G. S. 1949, 44-510 (3) (15)) and made an award accordingly.

The claimant appealed to the district court, where the court, after having carefully read and considered all the evidence and record taken and the award of the commissioner, and being fully advised in the premises, found that the award of the workmen's compensation commissioner should be modified, and specifically found that on September 28, 1949, claimant sustained an accidental injury to his left eye causing him to have a 100 per cent loss of visual acuity and to be industrially blind in that eye, which arose out of and in the course of his employment with respondent; and further found:

". . . that prior to claimant's said accidental injury to his left eye on September 28, 1949, claimant had suffered a previous disability of his right

eye and has a loss of vision in the right eye of 63.875 per cent, which in conjunction with the injury to his left eye renders claimant unemployable and industrially blind and totally and permanently disabled."

The court further found:

"That as a direct result of said accidental injury suffered by the claimant to his left eye on the 28th day of September, 1949, together with his said previous disability of claimant's right eye, the claimant became totally disabled on October 8, 1949, and is totally and permanently disabled from performing manual labor and physical labor; that by reason thereof the claimant is entitled to compensation for a period of 415 weeks provided for total and permanent disability."

The court further found the amount due at the date of hearing and ordered it to be paid in a lump sum, less the compensation previously paid. The court further found it to be an extreme case and that the claimant is in need of medical treatment and service for his injury and disability arising therefrom and is entitled to a further award of not to exceed the statutory maximum of $750 for medical care and treatment, less the sum of $71.52 previously paid. The award made was in harmony with these findings.

From these findings and award respondent and its insurance carrier have appealed and present three questions for decision: *First*, that there was no substantial, competent evidence to support the finding of the district court that the claimant is totally and permanently disabled. On this point claimant testified that after his injury on September 28 he returned to work October 5; that he tried to work, but would miss the nail, hit under it or over it; that he could not do any good using a saw or climbing ladders or working on a scaffold because he couldn't see well enough; that he could not fit the studding together; that he was unable to read—the lines all ran together and it gave him a headache; that he could see a person to recognize him 20 or 30 feet away if he were not standing between him and a light; that if there was a light back of him he could not recognize him even if he was as close as seven or eight feet away; that he thought he could drive nails, but that if he did that for two or three minutes his eye got to hurting, and he said to Mr. Trout, the foreman: "Can you see my eye?" and he said: "Did you get hurt?" The witness answered, "Yes," and Mr. Trout said, "It is watering so much I can't see it, but you better go to the doctor." He did go to Doctor Mehrle, who put some medicine in his eye and a bandage on it. He went back and told his foreman: "I won't be able to work," and he went home. That he did some work for a few days while working inside, but when he went outside he was

not able to work, and finally Mr. Trout told him: "Jim, you can't do the job, it is just wasting your time." He testified he could drive his car in the daytime if he was careful and drove no faster than 20 or 30 miles an hour, but did not drive at night. There was much more testimony to the same effect. He went back three or four times later to try to get work and was told that he was not able to do the work. He further testified that he could walk around on a level surface, but where it was uneven he could not see the low places. He would "just kind of step down like a blind horse that way." He further testified: "I couldn't see to do the work, I couldn't see enough to hold a job," and that he did not know whether he would ever be able to go out on a job and make a hand. None of this evidence was contradicted. We think it cannot be said that the court did not have substantial, competent evidence to support its finding that he was "totally and permanently disabled from performing manual labor and physical labor." The findings and award were made subject to the further order of the court or of the compensation commissioner.

The court took the report of Doctor Curran as to the visual acuity of each of the eyes; 20/100 of the right eye means that the claimant lost 63.875 per cent or, stated the other way, that he retained 36.125 per cent of the visual acuity of the right eye; 20/200 for the left eye means that the claimant had a loss of 100 per cent of the visual acuity of that eye. The court in finding the disability of claimant was not limited by the medical evidence. The court had authority to consider the testimony of the claimant as well as the medical evidence. (See, *Bull v. Patti Const. Co.*, 152 Kan. 618, 106 P. 2d 690; *Copenhaver v. Sykes*, 160 Kan. 238, 160 P. 2d 235; *Conner v. M. & M. Packing Co.*, 166 Kan. 98, 199 P. 2d 458, and authorities cited therein.)

Appellant's second contention is that if the court finds there is sufficient competent evidence to sustain the trial court's finding that claimant is totally and permanently disabled, then the compensation awarded claimant, other than for the loss of the left eye under G. S. 1949, 44-510 (3) (15), should be awarded against the second injury fund and not against respondent and its insurance carrier. It is clear the court based its award upon our statute [G. S. 1949, 44-510 (3) (24)], which reads:

"If a workman has suffered a previous disability and received a later injury, the effects of which together with the previous disability shall result in total permanent disability, then and in that event the compensation due said work-

man shall be the difference between the amount provided in the schedule of this section for his prior injury and the total sum which would be due said employee for such total disability computed as provided in section 44-511 of the General Statutes Supplement of 1945 and any amendments thereto, but in no case less than seven dollars per week nor more than twenty dollars per week."

This statute was a part of the general revision of our workmen's compensation law revised in 1927 (Chap. 232, Laws 1927). It has been held as applying to a situation such as we have here. (*Stevens v. Kelly-Carter Coal Co.*, 140 Kan. 441, 37 P. 2d 48; *Masoner v. Wilson & Co.*, 141 Kan. 882, 44 P. 2d 265). Counsel for appellant recognize that, but say that the statute was enacted and the decisions rendered prior to the adoption by the legislature of the statute pertaining to the second injury fund. That is correct. The second injury fund was first adopted by our legislature in 1945 (Chap. 221, Laws 1945), was slightly amended by Chapter 290, Laws 1947, and now appears in our General Statutes of 1949 as sections 44-566 to 44-572. The general purpose of the act is shown by its title, which reads:

"An Act to provide for the payment of compensation to a workman who has suffered a disability resulting from an injury to a specific member of the body while in the employ of a trade or business operation within the provisions of the workmen's compensation law and having suffered a previous disability as a result of the loss of, or the loss of the use of a specific member of the body while a member of the armed forces of the United States or while engaged in industry or otherwise the effects of both disabilities thereby resulting in total permanent disability; creating a second injury fund; making an appropriation therefor and providing for the administration of the act."

Section 1 of the act contains definitions and includes: "(3) 'Member of the body' means an eye, arm, hand, leg or foot." The second section reads:

"When a workman has suffered a disability resulting from an injury to a specific member of the body while in the employ of a trade or business operating within the provisions of the workmen's compensation law, and having suffered a previous permanent disability as a result of the loss of, or loss of use of, a specific member of the body while a member of the armed forces of the United States, or while engaged in industry, or otherwise, and the effects of both disabilities shall result in total permanent disability, then the total compensation due the workman shall be the amount for total permanent disability computed as provided in section 44-511 of the General Statutes Supplement of 1945 less the amount provided in the schedule set forth in section 44-510 of the General Statutes Supplement of 1945 or amendments thereto for his prior disability: *Provided,* That in no case shall the payments be less than seven dollars per week nor more than twenty dollars per week: *Provided, however,*

That the employer by whom the workman was employed when the workman received his second disability shall be liable only for the amount of compensation due as provided in the schedule set forth in section 44-510 or amendments thereto of the General Statutes Supplement of 1945 and computed as though the workman had suffered no previous disability: *And provided further,* That the remainder of the compensation due the workman under a total permanent disability award shall be paid from the second injury fund as hereinafter provided, but in no event shall the workman be entitled to receive as a result of a second injury more than the commissioner shall allow for total permanent disability less the amount provided for in the schedule set forth in said section 44-510 or amendments thereto for the first disability."

Subsequent sections create the second injury fund and provide for its administration. They are not specially material here. The section creating the second injury fund did not specifically amend or repeal G. S. 1949, 44-510 (3) (24). The result is that we now have both these statutes.

Counsel for appellants do not contend that the later statute (G. S. 1949, 44-566 to 44-572), providing for the second injury, repealed the earlier one [G. S. 1949, 44-510 (3) (24)]. It is argued that the later statute is supplementary to and should be considered together with the earlier one. We concur in that view. They do overlap to a certain extent. The earlier statute is somewhat broader in its scope than the later one, which particularizes the situations to which it applies. The earlier statute applies "If a workman has suffered a *previous disability* and received a *later injury,* the effects of which together with the previous disability shall result in total permanent disability. . . ." The later statute pertains to a "member of the body," and that term is defined to mean "an eye, arm, hand, leg or foot." It does not include any "previous disability," as the earlier statute does. The later statute applies "When a workman has suffered a disability resulting from an injury to a *specific member of the body* . . . and having suffered a previous permanent disability *as a result of the loss of,* or loss of use of, a specific member of the body . . . and the effects of both disabilities shall result in total permanent disability. . . ." It will be observed this statute deals with a loss or loss of use of the specific member of the body named in the statute. It does not deal specifically with a partial loss or loss of use of the named member of the body. In the case before us the compensation commissioner, and the district court on appeal, did not find that claimant had *lost* the right eye or had *lost* the use of it prior to September 28, 1949, but found only that claimant had sustained a partial loss of the use of the right eye, and for that

reason they concluded the second injury fund was not applicable. We are unable to say that this conclusion was erroneous.

Counsel, particularly in their reply briefs, have cited several cases from other jurisdictions. We have carefully examined those and many others. The statutes in the various states differ quite a little, with the result that there are differences in the conclusions reached by the courts in the cases that have come before them. However, none of the other jurisdictions, and we have examined more than twenty of them, have two statutes that must be considered, such as we have here. For that reason we think it is neither necessary nor would it be helpful to quote the statutes of other jurisdictions and analyze the cases decided thereunder. After all, our problem is to determine and apply our own statutes.

The third point argued by appellants is that the court erred in finding this to be an extreme case in which the claimant is entitled to medical treatment to the amount of $750. The point is not well taken. Appellants at the time of the hearing in the district court had expended a total of $71.56 for medical treatment. The other part of the money will not be used unless needed. The report of each of the doctors was that the claimant had cataracts on both eyes which might be removed at a later time. Therefore, additional medical treatment will be needed for that, and perhaps for other services. At the hearing before the examiner respondent tendered a treatment for the removal of the cataract if it would be done by a named doctor in Wichita, or anyone else who would not charge more than $125. This was refused by the claimant for the time being, at least, and appellants now contend that because such a tender was made and refused they should not be liable for any further medical treatment. The tender of treatment for removing the cataract at that time was futile for at least two reasons: The cataract was not ready to be removed, and second, the limitation of cost of removal was not justified. In the Rules and Regulations of the Compensation Commissioner of August 1, 1950, the recommended medical fee for cataract extraction is $150, but the commissioner was careful to state (on page 108) that "No hard or fast rule can be applied with respect to fees in all cases." The cataract may have to be removed from each eye. Since there was no medical attention needed at the immediate time what will be needed to be done, and the cost of it, can well be determined in the future.

We find no error in the record. The judgment of the trial court is affirmed.