No. 45,077

Glenn H. Piper, *Appellant,* v. Kansas Turnpike Authority and Phoenix Assurance Corporation, *Appellees.*

(436 P. 2d 396)

Opinion filed January 27, 1968.

*George E. McCullough,* of Topeka, argued the cause, and *W. L. Parker, Jr., Robert B. Wareheim, Reginald LaBunker* and *James L. Rose,* of Topeka, were with him on the brief for appellant.

*George V. Allen,* of Lawrence, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

Fatzer, J.: This is a workman's compensation case. The examiner, the director of workmen's compensation, and the district

court all denied compensation for permanent disability to the claimant, and he has appealed.

The facts are not in dispute and those pertinent follow: The claimant, Glenn H. Piper, is 56 years of age and was employed by the Kansas Turnpike Authority in October, 1956. He continued to work for the Authority until December 13, 1963, the date of the accident. On that date and while engaged in his employment, the claimant slipped and fell to a sitting position which caused injury to his left eye, as hereafter related, and also caused a hernia.

Prior to the accident, and on September 15, 1962, the claimant underwent a series of operations on both eyes, the result of which left him totally blind in the right eye and "industrially blind" in the left eye. The operation on both eyes was for the removal of cataracts, and resulted in what is known as "aphacic" eyes. That is, eyes without lens. Following the operation, vision in the left eye was approximately 20/800 for distant vision and considerably less than 14/140 for near vision. However, with the aid of glasses the left eye was corrected to 20/20 for distant vision and Jaeger-1 for near vision, which is the equivalent of Snellen 14/14.

As indicated, the operation on claimant's right eye was not successful, and it became painful. On May 25, 1963, the right eye was eviscerated, which removed all vision.

As a result of claimant's fall on December 13, 1963, he suffered an injury to his left eye known as a retinal detachment. The injury necessitated confinement in a hospital where surgery was performed on the eye and the retina reattached to the inner portion of the eye.

On February 6, 1964, the claimant suffered a second retinal detachment in the left eye following an attack of coughing and sneezing. A second surgical process was performed and the retina was again reattached in the left eye in its proper position. On April 14, 1964, the claimant sustained a third retinal detachment apparently from an unknown cause, and a third surgical procedure was performed. In this operation a tendon was removed from the leg to make the repair and the retina was reattached in its proper position in his left eye. The court found that the first, second, and third retinal detachments were all connected with the original injury on December 13, 1963.

As indicated, claimant's vision before the accident was less than 20/800 for distant vision and 14/140 Snellen for near vision, cor-

rectable by glasses to 20/20 and Jaeger-1. After the injury, the vision in his left eye remained at less than 20/800, but was no longer correctable to 20/20 and Jaeger-1. By the use of glasses, the claimant's left eye could be corrected only to 20/70 for distant vision and Jaeger-7 for near vision. The claimant testified that he can now only identify a person at twelve feet and can only read with the aid of a magnifying glass. Dr. Hill, a highly qualified ophthalmologist, testified that he did not expect appellant's condition to improve. At the time of the hearing before the examiner, the claimant was still under treatment.

Because of the danger to the claimant's left eye, the hernia was not repaired for some time so as not to endanger the surgical procedure to the left eye.

As a result of the claimant's fall and the detachment of the retina in the left eye, which was directly traceable to the fall, the claimant became unemployed because of blindness in his right eye, and the loss of vision efficiency in the left eye.

At the hearing before the examiner, the parties stipulated that the claimant sustained injury by accident on December 13, 1963; that the relationship of employer and employee existed on that date; that the parties were governed by the Workmen's Compensation Act and written claim for compensation was timely received; that the respondent Authority had an insurance carrier on the date of the accident; that claimant had lost the sight of his right eye prior to the accident, and that compensation had been paid for 62 weeks of temporary total disability at $42 per week through February 25, 1965, in the total sum of $2,604.

Following the hearing at which both parties introduced evidence, the examiner found the claimant's injuries arose out of and in the course of his employment; that his average weekly wage was $131.77, and that he,

". . . was industrially blind without corrective lenses prior to the accident and has received no permanent disability as a result of this accident, since such disability is measured without the aid of corrective lenses. The claimant has an aphacic eye condition, whereby the lens has been removed, and this does not allow the claimant to use lenses under the exception to the Director's Rules 51-8-9 for presbyopia (normal old sight), which has a medical definition as: 'The *condition of vision in the aged* due to diminished power of accommodation from *impaired elasticity of the crystalline lens* . . .' In one case there is no lens, and in the other case there is a lens that does not function normally . . .

"It is further found that no compensation should be paid for permanent disability, since the claimant was rated as industrially blind prior to the date of the accident. The claimant was temporarily totally disabled from December 13, 1963, to June 6, 1964, which appears to be the last date of treatment given to the claimant by the doctor. After this latter date, it appears that the claimant was merely under observation and did not see the doctor again until May 29, 1965. The claimant can see people from ten to twelve feet away and can read with a magnifying glass . . ."

In accordance with his findings, the examiner awarded compensation in favor of the claimant and against the Authority and its insurance carrier for 24.14 weeks of temporary total disability at the rate of $42 per week for a total sum of $1,014, which previously had been paid in full by the Authority and its insurance carrier.

Thereafter, the claimant appealed to the director of workmen's compensation who adopted the findings of the examiner in all respects, but modified them slightly in the area of medical expenses, and directed the Authority and its insurance carrier to pay all of the medical expenses incurred by the claimant as a result of his accident.

Feeling aggrieved, the claimant appealed to the district court which adopted the findings and award of the director as the finding, judgment, and award of the court, and entered judgment accordingly.

The claimant first argues the district court erred in finding that compensation for a bodily disability that involves the eye cannot be determined with the use of corrective lenses and that it interpreted the director's rule No. 51-8-9 strictly against the claimant rather than liberally in favor of an injured claimant as required by law. The regulation was adopted by the director as a basis for compensation for eye injuries and the principal authority relied upon was *McCullough v. Southwestern Bell Telephone Co.*, 155 Kan. 629, 127 P. 2d 467. The pertinent part of the regulation reads:

"If no dependable evidence shall have been produced that a workman had experienced a previous sight deficiency, the sight efficiency of an industrially impaired eye shall be assumed to have been industrially normal prior to the date of the industrial impairment of the eye.

"If an injured workman had no previous loss of visual efficiency, the evaluation of industrial visual loss, for the purpose of determining the amount of compensation due shall be based on visual efficiency findings which have been made without the aid of corrective lenses, except lenses which compensate only for presbyopia, (normal old sight) but the employer shall be required to supply corrective lenses as a part of his medical liability. (*McCullough v. Southwestern Bell Telephone Company*, 155 Kan. 629.)

"Where there is complete loss of vision of one eye, due to an industrially incurred injury, and industrial blindness exists in the fellow eye is not due to an industrially sustained injury, that more recent and complete loss of workman's only visually potent eye shall not be rated on the basis of the visual loss of a single eye, but shall be rated on the basis of a total permanent disability." (Emphasis supplied.)

We are of the opinion the exception in the rule allowing corrective lenses for presbyopia, which counsel for both parties have deemed of such importance, is wholly immaterial to the disposition of this case. To hold otherwise would be contrary to the express language of the rule itself.

The purpose of the rule was to assist the director in the administration of the Act (K. S. A. 44-573), and it is principally based upon the *McCullough* case hold that,

"Under our workmen's compensation law, when a workman sustains an injury to an eye so that the measurement of compensation is subject to the schedule, the percentage loss of vision should be computed without the aid of corrective lens." (Syl.)

There, the claimant was struck in the eye with a piece of gravel. The resulting loss of vision was about 85 percent without the use of glasses and about 20 percent with corrective glasses. The record indicated the claimant's "vision was normal in this eye before the accident . . ." and that since "there is no evidence whatever to show that this workman was required to wear glasses or corrective lens prior to the date of his accidental injury . . . the loss of vision of the eye should be determined without the aid of corrective lens . . ." (p. 630.) In the opinion it was said:

"We have no case in our state suggesting that compensation for the loss of leg, for the arm, hand, or other member of the body, where such compensation is provided by the schedule, should be decreased by the use of an artificial limb, or that a partial loss of such member should decrease the compensation because of the use of braces or other artificial appliances. . . ." (l. c. 633.)

Both the director's rule and *McCullough* proceed upon the assumption that, in the absence of dependable evidence otherwise, the workman had normal vision in the eye before the accident and was not required to wear glasses or corrective lenses prior thereto. Indeed, the express language of the rule that, "[i]f no dependable evidence shall have been produced that a workman had a previous sight deficiency, the sight . . . of an . . . eye shall be assumed to have been . . . normal . . ." and that, "[i]f an

injured workman had no previous loss of visual efficiency, the . . . visual loss . . . shall be . . . made without the aid of corrective lenses," clearly excludes its application in this case. The parties concede, and the district court found that, prior to his accidental injury, the claimant had previous loss of vision efficiency in the left eye, and we conclude such loss of vision lifts him from the scope of the rule.

Prior to his injury, the claimant had corrected normal vision in his left eye and he was able to perform his work in a usual and satisfactory manner. His corrected vision was just as valuable to him and to the Authority as was the unimpaired vision of his coemployees. Following the injury and the ensuing operations, he sustained a partial loss of vision in the left eye and all means of correcting the eye to normal vision. He is completely unable to perform the work he was doing prior to the injury, and can only see figures ten to twelve feet distant and is required to read with the aid of a magnifying glass. As is evident, the director's rule neither precludes nor specifically allows the use of corrective lenses with respect to the factual situation here presented.

Is the claimant to go uncompensated for his loss of vision? We think not. K. S. A. 44-510 (3) (c) (17) (21) provides for payment of compensation to an injured workman measured by a percentage of his average weekly wage for the loss of an eye, or the loss of sight of an eye, total or partial, attributable to a permanent injury. We find nothing in the statute indicating an intention on the part of the Legislature that corrective glasses may or may not be considered in determining loss of the whole or a fractional part of the vision of an eye. As indicated, the director's rule and *McCullough* are to the effect that where a workman has normal vision without the aid of glasses prior to an injury, the percentage of loss of vision should be computed without the aid of corrective lenses. However, we are of the opinion that neither the rule nor *McCullough* is applicable to a workman who sustains a total or partial loss of vision in an eye which, although "industrially blind" from natural or other causes, has been restored to its normal use with the aid of corrective glasses.

This court has not considered a case directly in point, and we feel none of our previous decisions determine the issue. However, other jurisdictions have decided the identical question. In the oft-cited case of *Lambert v. Industrial Com.*, 411 Ill. 593, 104 N. E. 2d 783, the

supreme court of Illinois considered an almost identical case, and the court said:

"The real difficulty, and one of the causes of the lack of harmony in the authorities, lies in the fact that neither rule [allowing or disallowing corrective lenses] is adequate to cover *all* cases. If naked vision, *alone*, is considered, the worker with corrected vision is not adequately protected, and if corrected vision, *alone*, is considered, the worker with uncorrected vision is not fully protected. In the first instance, the loss of an eye 'industrially blind' with naked vision, but normal with correction, would not be compensable; in the second, an injury rendering a normal eye industrially blind would not be compensable if it could be corrected to normal by the use of glasses." (p. 604.) (Emphasis supplied.)

See, also, *Foster v. Schmahl,* 197 Minn. 602, 268 N. W. 631; *Walsh Constr. Co. v. London,* 195 Va. 810, 80 S. E. 2d 524.

It is obvious to this court there are at least two entirely different types of eye injury cases resulting from industrial accidents and the supreme court of Illinois has capably stated the dilemma. It is equally obvious that a plausible and just solution to the problem would be the approval of two rules to assist the director and the district courts in determining the amount of compensation due, if any, in eye injury cases. The first, as presently stated in director's rule No. 51-8-9 and supported by *McCullough,* and the second, to permit the aid of corrective lenses where the injured workman had a previous loss of vision efficiency which was corrected by glasses; the loss being the difference between the corrected vision before the injury and the corrected vision thereafter.

Our Workmen's Compensation Act should be interpreted and applied in a practical and common-sense manner to accomplish its ultimate purpose. The theory behind the Act is that industry rather than society should care for its wrecked manpower. The use of glasses as an aid to vision is commonly understood and employed. It is common knowledge that without glasses many persons whose vision is practically normal with glasses would be unable to carry on their work without them. This is true of many people in all trades and professions. Such persons are not totally disabled by any means. To say that one who has a naked vision of only 20/800 for distant vision and considerably less than 14/140 for near vision, but with the aid of corrective glasses has a 20/20 vision, is industrially blind, is an absurdity. In *Stone v. Industrial Comm.,* Ohio Com. Pl., 93 N. E. 2d 67, it was said:

"The benefits of science and medicine are meant for the enjoyment of people, and where by a correction through scientific adjustments a person is blessed with greater sensory capabilities, those persons should be recognized for those greater sensory powers rather than to relegate them to an inferior status to which they must readily descend without corrective measures." (p. 70.)

Accordingly, we are of the opinion a reasonable construction of the Act requires we hold that one possessing efficiency of vision by the use of corrective glasses following a cataract operation may not be classified as being industrially blind in the pursuit of his employment. Where, as here, an injured workman had a previous loss of visual efficiency which was corrected by glasses to normal sight, the percentage of loss of vision for compensation due under the Act is based on visual efficiency findings made with the aid of corrective lenses; the loss being the difference between the corrected vision before the injury and the corrected vision after the injury.

In view of the foregoing, this court is of the opinion that the claimant, Glenn H. Piper, should be given the advantage of his gains physically by correction, and when that advantage is taken away from him by an injury to his eye in the course of his employment, he should be compensated.

This court has no original jurisdiction in compensation cases. Its jurisdiction is limited to a review of questions of law decided by the district court. The review in this case has been completed, and it has been determined the district court erred as a matter of law in denying the claimant compensation based upon the director's rule No. 51-8-9. This requires a reversal of this cause. Since the district court has not determined from the record whether the claimant's disabling injury is permanent in nature, and if so, whether such impairment is total or partial in character, it is necessary to remand this case to the district court to make findings based upon the evidence and determine the amount of compensation, if any, due the claimant.

In reviewing the record, the district court should be guided by what was said and held in *Polston v. Ready Made Homes*, 171 Kan. 336, 232 P. 2d 446, and *Justice v. Continental Can Co.*, 174 Kan. 539, 257 P. 2d 564, and whether, as a result of the accidental injury to the claimant's left eye on December 13, 1963, together with the previous disability of the claimant's right eye, he became totally disabled.

In both the *Polston* and *Justice* cases reference was made to the second injury fund. (See K. S. A. 44-567[a].) The second injury fund is not applicable to the instant case. The Authority, as the claimant's employer, did not file a notice with the director of workmen's compensation describing the claimant's handicap following his cataract operations and the evisceration of his right eye, and thereby relieve it from payment of compensation as therein provided. (K. S. A. 44-567[a].)

The judgment of the district court is reversed, and the cause remanded with directions to proceed in accordance with this opinion.