GENERAL MOTORS CORPORATION, a Corporation of the State of Delaware, Employer-Appellant and Cross-Appellee Below, Appellant, Cross-Appellee,

v.

Eugene COULBOURNE, Jr., Claimant-Appellee and Cross-Appellant Below, Appellee, Cross-Appellant.

Supreme Court of Delaware.

Submitted Sept. 10, 1979.

Decided Nov. 7, 1979.

Reargument March 12, 1980.

Original Decision Confirmed May 19, 1980.

Max S. Bell, Jr. of Richards, Layton & Finger, Wilmington, for employer-appellant.

Stanley C. Lowicki, Wilmington, for claimant-appellee.

Before McNEILLY, QUILLEN and HORSEY, JJ.

QUILLEN, Justice:

In this Workmen's Compensation appeal the employer, General Motors Corporation

(GM), challenges a decision by the Superior Court modifying an original finding by the Industrial Accident Board (Board). The Board had ruled claimant Coulbourne was entitled to compensation for having lost in an industrial accident 83% of normal vision, and the Superior Court increased the award to compensate him for a 100% loss. GM claims Coulbourne should only be compensated for a 3% loss of vision.

This dispute focuses on the application of Sections 2326(a) and (c) of the Workmen's Compensation Act to the instant situation,[1] where Coulbourne, having suffered a loss of 97% of the vision in his left eye in an injury prior to becoming employed by GM, later suffered a detached retina of his left eye as the result of a job-related mishap there, and consequently lost all remaining vision in that eye.[2]

■ Coulbourne's ophthalmologist testified before the Board that in a 1971 examination, after the first injury but before the second, he found his left eye vision to be 97% impaired but correctable to a 17% impairment through the use of a hard contact lens. He also stated that some people are unable to wear hard contact lenses. Coulbourne gave up his attempts to wear a hard lens after several weeks because of irritation, and was functioning with 3% of his left eye vision when hired by GM. GM had conducted an eye examination before hiring

him and found him to be "industrially blind" in his left eye.[3] The Board found that Coulbourne could see light and dark, and could see objects approaching him, with his unaided left eye.

GM contends that it was error to award Coulbourne compensation for that fractional part of vision loss that had occurred prior to the industrial accident, and that since Coulbourne had only a 3% visual capacity when the second loss occurred, that should be the extent of the award. GM also claims that is was error for the Superior Court to consider increasing the Board's award when Coulbourne had not appealed from the award part of the Board's decision.

■ Coulbourne has filed a cross-appeal, objecting to the Trial Court's affirmance of the Board's decision that he had failed to meet his burden of proof on the issue of loss of earning capacity resulting from the second eye injury. He testified that the GM foreman asked him to transfer to a janitor's position because he kept getting cut at his assembly line job. The janitor's pay was 44 cents less per hour. To demonstrate the voluntary and routine nature of the transfer, witnesses for GM testified that five workers had turned down the janitor position before it was offered to Coulbourne, that he had filed no grievance after the transfer, and that there were several objective reasons why such a job can be preferred despite the lower hourly wage.

1. 19 *Del.C.* § 2326 provides in relevant part:
"§ 2326. Compensation for certain permanent injuries.
"(a) For all permanent injuries of the following classes, the compensation to be paid regardless of the earning power of the injured employee after the injury shall be as follows:
&ast; &ast; &ast; &ast; &ast; &ast;
"For the loss of an eye, 66⅔ percent of wages during 200 weeks;
"For the loss of a fractional part of the vision of an eye, the compensation shall be for such percentage of the total number of weeks allowed for the total loss of the use of an eye under this section as the loss suffered bears to the total loss of an eye.
&ast; &ast; &ast; &ast; &ast; &ast;
"(c) Total loss of the use of a hand, arm, foot, leg or eye shall be considered as the equivalent of the loss of such hand, arm, foot, leg or eye."

2. At oral argument it was noted that the claimant subsequently lost his eye but that is not part of this record which is presented as a total loss of use case.

3. It has not been brought to our attention that the phrase "industrially blind" has any statutory or Delaware case law significance. We do not feel that the categorization should be used to deprive a worker with impaired yet efficient vision of compensation when an accident causes an actual loss of that capacity. See *Stone v. Industrial Commission*, Ohio Com.Pl., 93 N.E.2d 67 (1950); *Rogers Inc. v. Fishman*, 154 Colo. 122, 388 P.2d 755 (1964) (en banc); *Piper v. Kansas Turnpike Authority*, 200 Kan. 438, 436 P.2d 396 (1968).

On the cross-appeal, we feel that the Superior Court was correct in affirming the Board's decision. The Board made a factual determination, not unreasonable on the record presented, that Coulbourne had not met his burden of proof on the issue of loss of earning capacity resulting from his injury, and we will not disturb it. The Industrial Accident Board is the trier of fact. *Johnson v. Chrysler Corporation*, Del.Supr., 213 A.2d 64 (1965).

In the main appeal, we accept the factual finding of the Board on the percentage of capacity for vision that Coulbourne had at the different times relevant to his claim, despite contentions that have been raised attempting to throw doubt on the accuracy of these findings. There was an opportunity to present evidence to the Board, and we are bound by the reasonable conclusions it drew from the evidence presented. Thus, we accept as fact that the claimant's left eye vision was 97% impaired but correctable to a 17% impairment through the use of a hard contact lens.

GM contends that the Superior Court erred in increasing Coulbourne's award, which was to compensate for an 83% loss of vision as determined by the Board, to an award for a 100% loss. In changing the award, the Superior Court also changed the theory on which it was based. The Board had decided that Coulbourne was entitled to an award for that fractional portion of complete normal vision that he had lost in his second accident, and chose the 83% figure as the maximum his left eye was capable of when corrected by the hard contact lens. The Superior Court agreed that the amount of vision lost could in a proper case be evaluated from the standpoint of corrected vision prior to an industrial accident. However, it stated that his discomfort from the hard lens left Coulbourne, in effect, with

3% of normal vision.[4] The 100% loss, then, was predicated on the fact that Coulbourne had lost 100% of what he had before the GM accident. Even if he only had 3% of normal use, the Court below reasoned that the statute did not restrict recovery for total loss of an eye to only those in perfect condition at the time of loss, and that "any other result would foreclose a full award to everyone except those with normal vision, corrected or uncorrected, prior to the injury."

■ Turning first to the argument that the Superior Court erred in increasing the award for loss of vision under 19 *Del.C.* § 2326 since the claimant did not appeal to the Superior Court from that aspect of the Board's decision, we agree that ordinarily a cross-appeal is necessary to preserve rights. But in this case the employer's appeal raised the very issue the Superior Court decided. The basic facts, as found by the Board, were accepted by the Superior Court, that Court differing with the Board only on the application of the law. In this context, we think it would be unduly restrictive to hold that the Superior Court could not correctly apply the law, as that Court sees it, on the very issue raised by the appeal. The Delaware Workmen's Compensation Act is liberally construed with regard for its intended benevolent purpose. *Mosley v. Bank of Delaware*, Del.Supr., 372 A.2d 178, 179–180 (1977).

■ The merits of GM's appeal give us more difficulty. From § 2326(a), which speaks directly to the situation of loss of vision, there does appear some statutory policy to compensate for the percentage of loss suffered. This is clear when the loss is less than total. In theory, it can certainly be persuasively argued that a fractional loss suffered by one with a partial impairment

4. The Superior Court noted: "The possibility for correction existed and, even though an earlier attempt had proved unsuccessful, other corrective measures, such as the use of 'soft' contact lenses had not been employed." We share that Court's obvious concern that, evidently due to uncertainty of legal standards, there was no real expert evidentiary focus on correctability prior to the accident. But, under our view of the case, we need not explore this problem.

resulting in the total loss of use of the eye should not be treated any differently than a fractional loss suffered by one with normal vision resulting in a partial impairment. To do otherwise may effectively allow recovery against the employer for prior injuries entirely unrelated to a claimant's employment, when the effects of such prior injuries combine with the present one to produce total loss. This would appear to be contrary to the general purpose of the Act (19 *Del.C.* § 2304), which is to provide "compensation for personal injury or death by accident arising out of and in the course of employment." It also would appear to be contrary to the policy of the second injury fund (19 *Del.C.* § 2327) which attempts to limit the employer's liability for a subsequent permanent injury to the effects of that injury alone, while setting up a special fund to recompense the totally disabled worker, the cumulative effects of whose successive injuries are not attributable to the last employer in time.

But the statute here specifically states that "[t]otal loss of the use of a[n] . . . eye shall be considered as the equivalent of the loss of such . . . eye." 19 *Del.C.* § 2326(c). It is important to note that, notwithstanding the policy of percentage recovery for partial loss of vision in § 2326(a), this total loss of use provision in subsection 2326(c) includes "[t]otal loss of the use of a hand, arm, foot, leg or eye". It certainly would be difficult to conclude that the General Assembly intended for there to be any normal strength requirements for the limbs other than the eye especially since

partial compensation for such limbs under § 2326(a) is based on portions physically severed. We think the Superior Court was correct when it said that "[n]owhere does [§ 2326(c)] predicate recovery on an injury to a normal eye."

Our view of our statute is reinforced by cases from other jurisdictions. Cases from several states have held that an injury resulting in a loss of vision is compensable at full scheduled rates despite a prior permanent injury to the eye. See *Herbst v. Ind. Schl. Dist. No. 793*, 292 Minn. 466, 194 N.W.2d 273 (1972); *Moser v. Warner Gear Division of Borg-Warner Corp.*, 256 Ind. 598, 271 N.E.2d 465 (1971); *Standard Testing and Engineering Company v. Bradshaw*, Okla.Supr., 442 P.2d 337 (1968); *Cox v. Intermountain Lumber Co.*, Idaho Supr., 439 P.2d 931 (1968).[5]

Thus, while we recognize logic in the employer's argument, we find that the General Assembly by enacting the scheduled benefits contained in 19 *Del.C.* § 2326(c) has foreclosed the position advocated. The judgment of the Superior Court is affirmed.

---

**5.** The view taken here based on the statute, 19 *Del.C.* § 2326(c), makes it unnecessary to consider *Alessandro Petrillo Co. v. Marioni*, Del. Super., 131 A. 164 (1925) and partial impairment situations. In that case, the Court upheld an award for 80% loss of vision where the claimant had no prior impairment prior to the accident and an uncorrected 80% impairment after the accident which was correctable by the use of corrective lenses to a 10% impairment. But obviously that case does not necessarily foreclose consideration of a flexible rule which would give realistic recognition to the general use of corrective devices. See *Piper v. Kansas Turnpike Authority, supra; Lambert v. Industrial Commission*, 411 Ill. 593, 104 N.E.2d 783 (1952).