No. 42,733

KENNETH JACK TURNER, *Appellee*, v. SPENCER-SAFFORD LOADCRAFT, INCORPORATED and COMMERCIAL STANDARD INSURANCE COMPANY, *Appellants*.

(368 P. 2d 630)

Opinion filed January 20, 1962.

Robert J. Hill, of Wichita, argued the cause, and Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Gerrit H. Wormhoudt, Philip Kasse-

*baum, John E. Rees, Robert T. Cornwell, Willard B. Thompson,* and *David W. Buxton,* all of Wichita, were with him on the briefs for the appellants; *Hugo T. Wedell* and *Homer V. Gooing* of counsel.

*Fred R. Vieux,* of Augusta, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This is an appeal from an award and judgment in favor of claimant in a workmen's compensation case wherein the district court, with one minor exception not here material, adopted as its own the findings and conclusions of the commissioner.

In the hearing before the commissioner it was stipulated that on March 5, 1959, claimant met with personal injury arising out of and in the course of his employment when a piece of steel became embedded in the cornea of his left eye. Written claim was served on September 8, 1960.

Phil W. Harding, safety director for claimant's employer, testified that since claimant had no automobile he took claimant to the offices of Doctor Anderson and Doctor Barber in Augusta immediately after the accident. Harding also testified the company did not stipulate to what particular doctor an injured employee should go and he later granted claimant permission to go to Doctor J. H. Johnson, an eye doctor in El Dorado. As safety director, Harding made out reports on all accidents and sent them into the Workmen's Compensation Commissioner. When he took an injured workman to the doctor, the matter was then between the insurance company and the doctor. The employer assumed the insurance company would pay the doctor bills in this case as it had in all others. After Harding saw that an injured employee got to a doctor, and made out his report of the accident, his only other responsibility was to make sure the employee was released by the doctor before he came back to work. Harding then turned in his final report on the case. He had been safety director for this employer for five years.

The physician's report of Doctor J. H. Johnson, who had been an eye, ear, nose and throat specialist in El Dorado since 1928, was that he first treated claimant on March 6, 1959. He testified he had treated claimant again on March 7, 8, 9, 12, and 16 of that year and claimant's visual acuity efficiency loss in his left eye was 37.625 with corrective lenses. The report did not indicate the loss without corrective lenses. The doctor's description of the nature and extent of claimant's injury as shown in his report was:

"A foreign body deeply buried in left cornea at 11 o'clock 1½ mm from center of pupil. *A lot of infection about it,* only upper part of cornea from 11 to 2 is clear." ( Our emphasis. )

Doctor Johnson further testified that on March 28, 1959, claimant returned to him and complained of severe pain deep in his eye although there was no particular redness of the eye. That was the first hint Doctor Johnson had there might be any complications at all. He gave claimant phenobarbital to relieve the pain. On April 1, 1959, claimant returned to him and was again given phenobarbital because he was very nervous. Doctor Johnson found no infection at that time. When claimant returned on April 24, 1959, the eyeball was jumping around and he was having trouble focusing the eye. On May 18, 1959, claimant had 20/40 vision in his injured eye but said he was working and was less nervous. Doctor Johnson again gave him phenobarbital. In June, 1959, Doctor Johnson saw claimant on the 22nd and his eyes were fairly comfortable and on July 27, 1959, he treated him for the last time. Claimant's vision was getting worse all the time.

Doctor Johnson also testified that the infection and inflammation were not completely gone when he last saw claimant on July 27, 1959, because claimant was still told to come back, "but *it was almost gone.*" ( Our emphasis. ) During his testimony Doctor Johnson, in answer to questions concerning the *exact* cause of the degeneration of the macula in this claimant's left eye made a very appropriate statement when he said, "I know what you attorneys feel, each of you would like to have me say *exactly* what causes this . . . *exactly* what causes it, and I am not smart enough to tell you." ( Our emphasis. ) We should perhaps pause to note that the medical testimony in this case, as in many others, supports Doctor Johnson's above statement because medical witnesses generally avoid statements as to exactly what has caused, or has not caused, a certain physical condition.

Over the period of time involved claimant had two "lead" men, Donald E. Huffman and Everett Bloom, who were his superiors. They both testified it was the duty of Mr. Harding, the safety director, to keep track of doctors and he had the authority to see that injured employees went to the doctor and that proper reports were made. They remembered claimant had asked them many times for permission to go to the doctor but they did not remember that the name of any particular doctor was mentioned in his requests.

Claimant testified that on August 18, 1959, Myron Hull, adjuster for his employer's insurance carrier, in a conference in his employer's office, asked him if he was supposed to go back to Doctor Johnson and he replied, "Yes." Hull then said, "You hold off until we notify you." Hull in his testimony admitted the conversation and the statement of claimant that claimant was supposed to return to Doctor Johnson the next Monday for what he supposed would be a final examination. Hull did not definitely remember that he told claimant to go back to Johnson because he was relying on some notes he had made of the conversation, but he had absolutely no recollection of making a statement that claimant should not go back to Doctor Johnson.

According to claimant's own testimony, two or three weeks later he approached Huffman, seeking permission to go to the doctor and Huffman referred him to Bloom, who apparently was superior to Huffman. He was seeking permission from either Huffman or Bloom and the permission was not only to leave work, or go to the doctor after work, but he was also getting permission "for the insurance to pay the bill." Bloom told him he could go to any doctor he wanted to and that the insurance company would take care of it.

Thereafter claimant went to Doctor Frank Cvetkovich of Augusta, who testified that toward the end of October, 1959, he treated claimant twice for inflammation of the left eye at which times claimant just told him he had the "red eye." Then during the second week in March, 1960, claimant saw him a third time and informed him as to what had happened in regard to his eye. The doctor suggested that he be allowed to send claimant to the Wichita Clinic. He did not do any testing or treating and suggested treatment by a certified ophthalmologist. Doctor Cvetkovich was a general practitioner and had treated claimant and his family prior to this incident. Based upon a hypothetical question he was asked if he had an opinion as to whether complete loss of vision could be of traumatic origin under certain factual circumstances. He answered in the affirmative testifying:

"A. Well, then trauma could do it.

"Q. In your opinion did it do it, assuming all those facts to be true? A. *Yes, because it wouldn't be nothing else that could happen in that length of time.*

"Q. Do you think, then, that this impaired vision then resulted from the trauma, in your opinion? A. *Well, if that other eye has good vision and this*

*one went bad, as supposedly it did, then I say it was traumatic in origin."* (Our emphasis.)

On March 16, 1960, Doctor Cvetkovich saw claimant the last time. Approximately in October, 1960, a girl from the office of claimant's employer, Spencer-Safford Loadcraft, Incorporated, called him in regard to a bill for the Turner account. He stated he had a bill but did not know to whom to send it because he did not know the name of the insurance company. She replied, "Send it to us," but he had not done so. He further answered that he would do it sooner or later.

Claimant had the right to rely on statements made to him by his superiors, who were agents of his employer, as well as upon statements made by the adjuster for his employer's insurance carrier, that he could go to any doctor of his choice and the insurance company would pay the bill. Thus we have a much stronger case on this point than was present in *Johnson v. Skelly Oil Co.,* 180 Kan. 275, 281, 303 P. 2d 172, because here the employer's safety director testified both he and the employer had the same understanding as to the insurance carrier paying the bill by reason of its customary procedure after the safety director made his accident report to the commissioner and the insurance carrier. This, coupled with the call Doctor Cvetkovich received from the employer's office informing him he was to send his bill to the employer, fortified the proposition that the time for serving the claim was extended by the furnishing of medical treatment to March 16, 1960.

Claimant testified he had obtained permission either from Bloom or Huffman each time he had gone to see Doctor Cvetkovich. His written claim was served on September 8, 1960, and considering the over-all record we are of the opinion the commissioner's summary of the evidence was correct in stating:

"Written claim for compensation was received by the respondent on September 8, 1960—176 days after the claimant had last been treated by Dr. Cvetkovich."

The trial court accepted and adopted the findings, conclusions, and award of the commissioner. Whenever the record supports an award allowing or denying compensation the judgment of the district court is conclusive. (*Burns v. Topeka Fence Erectors,* 174 Kan. 136, Syl. ¶ 5, 254 P. 2d 285.) See, also, *Wilson v. Santa Fe Trail Transportation Co.,* 185 Kan. 725, 738, 347 P. 2d 235. The trial court was not required to make technical findings of fact, as

contended by respondents, and the award was sufficient if supported by competent substantial evidence. (G. S. 1949, 44-523.)

Doctor W. G. Gillett of Wichita, a witness for claimant, is an eye specialist who has practiced since 1924. He had not seen claimant until after the claim had been filed. He was asked, in a hypothetical question by claimant's counsel which fairly stated the situation as reflected by the record, if he had an opinion as to whether the loss of the sight in claimant's left eye (then 20/200) was the result of the trauma of March, 1959. The doctor answered, "Yes, I'd *have to assume it.*" (Our emphasis.) Later he testified:

"Well, in the first place, the macula area of the retina in this case is destroyed *and it can be destroyed by trauma* and it can be caused by repeated inflammation in the eye, and the fact that he had treatment over such a long period of time without any other cause for the condition, *one would naturally assume that the injury could be the cause.*" (Our emphasis.)

From Doctor Gillett's experience he obviously thought the condition could be the result of the trauma. His testimony continued:

"Q. Would you say it would be a reasonable probability? A. Well, over a long period of time like that of continued inflammation *it could be a reasonable possibility* . . .,"

and he further stated:

"Well, yes, *it is a reasonable possibility due to trauma and the subsequent inflammation.*" (Our emphasis.)

Doctor Gillett then explained how infection in the front part of the eye can cause difficulty to the macula as follows:

"Q. . . . If I understand you, it is extremely unusual for infection in the front part of the eye to spread back as far and cause difficulty to the macula? A. In the macula, it is unusual.

"Q. Now in what way would the infection go back to the macula? A. Follow the middle coat of the eyeball.

"Q. Or the retina? Oh, the middle coat? A. The middle coat. The inflammatory process can follow back in the middle coat of the eye and the inflammatory condition can produce enough disease to involve the macula.

"Q. What would that disease be known as, Doctor? A. Well, the condition that he now has is known as central retinal adenopathy.

"Q. Is that a disease or just a condition? A. That is a condition."

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. If I understood awhile ago, you said if this inflammation process started back along the inner layer toward the macula that it would be pretty hard to stop that infection, you just doubt if it could be done? A. Well, a fortunate thing about that remark is that you very seldom ever see an involvement of the macula from this kind of a thing. Usually the anterior segment of the eye is involved, of course—

"Q. By that, the front, in layman's language? A. The front layer. But it isn't a common occurrence to find a condition like this followed by all this inflammation and all this length of treatment."

On re-direct examination, Doctor Gillett further testified:

"Q. Now by that you mean you do not generally have one of these traumas and have this long lengthy treatment, it is an unordinary situation? A. Yes, that is an unordinary circumstance, because usually the foreign bodies, whether they are one or more embedded in the cornea, when you get them out they quiet down.

"Q. It is cured. But that would agree to the fact this long period involved after the trauma, with inflammation, would lead to a reasonable—would lead you to believe that it would be reasonable to conclude it was a result of the trauma and the inflammation afterwards, the fact of this long treatment— A. *That is more likely to be that than anything else.*" (Our emphasis.)

Another expert medical witness, Doctor Donald A. Relihan, an ophthalmologist practicing in Wichita, who also examined claimant after the claim had been filed, testified for respondents. His opinion was there had not been an inflammatory reaction in the macula secondary to any inflammation elsewhere in the eye that resulted in loss of vision. As a result of his examination of claimant he found claimant's right eye was completely normal and he was industrially blind for all practical purposes in the left eye, which could not be improved with lenses. He stated there could be changes in the macula as a result of injury but not from an injury of this type. He could possibly exclude certain causes but he could not be certain as to the exact cause of the injury that brought about the degeneration of the macula in claimant's left eye.

In the case at bar claimant's contention as to his good eyesight prior to the accident and the fact that he is now industrially blind is similar to that of claimant in *Whitaker v. Panhandle Eastern P. L. Co.,* 142 Kan. 314, 46 P. 2d 862, where claimant relied on the fact that he was in good condition before attempting to load a 250 pound gas tank onto a Ford truck (at which time his foot slipped, the tank threw him backward, and he felt strain or soreness through his stomach and across his back) and the fact that he began to feel sick soon thereafter. The only medical testimony furnished by that claimant was "it was *possible* that an accident such as that described by claimant *might* have caused his condition." (Our emphasis.) (p. 317.) In reversing the trial court's judgment for claimant, this court stated:

"Taking all the evidence in this case in its most favorable light for claimant and giving claimant the benefit of all inferences to be drawn from the proven and admitted facts, the conclusion to be drawn rises but little higher than a surmise or conjecture." (p. 318.)

However, in our case it has been established there was a foreign substance in claimant's eye and that there was deterioration of the sight of that eye. Claimant testified that prior to his accident his left eye was as good as his right eye and there is no evidence to refute that testimony. From all the evidence it is uncontradicted that claimant's right eye still has normal vision but he is industrially blind in his left eye. In addition, medical testimony as set out herein shows there was a reasonable possibility, and it was clearly possible (*Son v. Eagle-Picher M. & S. Co.*, 144 Kan. 146, 149, 150, 58 P. 2d 44) there was a causal connection between the trauma and infection and the resulting blindness in claimant's eye.

The circumstantial evidence shows that from time to time claimant requested permission to see the doctor and while his "lead" men, Bloom and Huffman, did not know the particular doctor's name in each instance, they did grant him permission to see a doctor. Doctor Gillett testified and traced the manner in which, in his expert opinion, the infection and inflammation could follow from the front portion of the eye back through the middle layer to the macula. In *Long v. Lozier-Broderick & Gordon*, 158 Kan. 400, 403, 404, 405, 147 P. 2d 705, a foreign object became lodged in the claimant's left eye and the same question was presented there that is presently before us, namely, whether the accident was the cause of the loss of vision. Affidavits of three doctors were given but none of the medical testimony showed any causal connection between the accident and the resulting loss of vision. Claimant, with permission of the court, obtained an additional letter from a Doctor Nelson which stated:

" 'It is my opinion that a foreign body in the eye may have been the cause of the uveitis with which you were suffering when I first saw you.' " (p. 402.)

Claimant therein testified:

" 'Doctor Nelson examined me and kept close watch on it. He said I had a bad case of some kind of infection and that he wanted to watch it pretty close. I think I went every day for three weeks, then after that about two or three times a week. He said it wasn't entirely healed up.

" 'Q. What did he tell you the slag had done to your eye? A. He said it had caused little scars on the eyeball, the pupil and caused me not to be able to have the vision out of that eye that I should.' " (p. 403.)

The doctor's statement and the testimony of claimant, above-quoted, were held to be sufficient to establish causal connection.

It may be helpful to set out briefly a few other typical cases showing what this court has in the past considered competent substantial evidence as a basis for the trial court's determination in allowing an award of compensation to a claimant. In *Copenhaver v. Sykes,* 160 Kan. 238, 160 P. 2d 235, claimant was a pumper on the employer's oil lease and while cranking an engine, he was kicked and thrown back about four feet against a steel box. An award was made by the trial court in favor of claimant and respondents' contention there, as here, was there was no substantial evidence to support the trial court's finding of disability. Five doctors saw claimant and all of them advised surgery. This court in the opinion stated:

"A letter from Doctor Eaton of the Mayo Clinic under date of September 13, 1943, clearly discloses that doctor *suspected* appellee had a protruded intervertebral disc. In other words that one of the cartilages between the vertebrae had slipped out of place and was pressing on the nerve roots which make up the sciatic nerve." (p. 241.) (Our emphasis.)

Doctor Donald Hickel, a captain in the medical corps of the army of the United States, made an examination of claimant that resulted in his being classified as 4-F. His report showing claimant's ruptured intervertebral disc was as follows:

" '12. Deformities, atrophies, and other abnormalities, diseases, or defects not included above. Has history of ruptured intervertebral disc—untreated.

" '13. Scars of serious injury or disease wears back corset.

" 'I have found this applicant abnormal under the following headings: History *and sign of ruptured intervertebral disc rupture* untreated except by belt.

" 'In my opinion, applicant is capable of performing duties involving *None Physical exertion.*

" 'Remarks: Reason: *not employable untreated ruptured intervertebral disc.* (Our emphasis.)" (pp. 241, 242.)

The opinion in the Copenhaver case by use of the following language very succinctly and clearly set out why the testimony there was not pure speculation and conjecture:

"In the first place there is no question here concerning the fact that appellee sustained an injury in the course of and growing out of his employment. In the second place, there is positive testimony not only by appellee but by the doctors that appellee suffered pain in the exact region of the back where appellee struck the steel box. There was also positive testimony by Doctor Dickson that appellee was incapacitated for work on August 6, 1942, and would remain so until his condition was corrected by an operation. There was testimony not only by appellee but by appellant, his employer, that prior to the injury appellee was strong and did heavy work. The pain now centered

in his back and was continual. The pain in his back and legs was much more acute following the accident and prevented the continuance of the work he had done prior to the accident. Doctor Hickel's examination, as reflected by a letter dated May 30, 1944, disclosed not only history but '. . . sign of ruptured intervertebral disc. . . .' It is stated appellee was un-employable by reason of '. . . untreated ruptured intervertebral disc. . . .' Moreover, duration of disability is not required, in this case, to be established by expert testimony. (*Hardwell v. St. Louis S. & R. Co.*, 146 Kan. 870, 876, 73 P. 2d 1120; *Bull v. Patti Const. Co.*, 152 Kan. 618, 106 P. 2d 690.)" (p. 242.)

As to expert testimony, we call attention to *Barr v. Builders, Inc.*, 179 Kan. 617, 296 P. 2d 1106, wherein claimant's disability was diagnosed as conversion hysteria. He had fallen from a scaffold into a window of a house on which he was working. He struck his back and ribs on the window sill from whence he fell to the ground. This case dealt principally with substantial evidence and the testimony of Doctor D. V. Conwell was set out and discussed. As to whether there was traumatic relationship between the injury and disability, the doctor was quoted as follows:

"We thought he (claimant) had a nervous condition called a conversion hysteria . . . the conversion hysteria reaction he had may well be the result of that trauma . . . a conversion hysteria could well follow the trauma in an hour, a week or month or two months afterwards, if he had persistent symptoms . . .," (p. 625.)

and this court held in favor of the claimant on the proposition there was substantial evidence on this point. See, also, *McDonald v. Rader*, 177 Kan. 249, 251, 252, 277 P. 2d 652.

Comparing the expert testimony in our present case with that in the foregoing cases, we are of the opinion it went even further in establishing a causal connection between the accidental injury and the loss of sight in claimant's left eye by reason of a degenerated macula.

Only the most pertinent portions of the record have been herein discussed but considering the record in its entirety and the points particularly emphasized, we are compelled to determine, as the court did in *Vera v. Swift & Co.*, 143 Kan. 593, 56 P. 2d 96, that the judgment for compensation should be affirmed because:

"Under the circumstances the court does not feel authorized to say there was no substantial evidence to sustain the findings of the district court. . . ." (p. 605.)

Judgment affirmed.