# Richmond

## Jake Preston Carter v. Hercules Powder Company, et al.

January 24, 1944.

Record No. 2754.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Thomas J. Surface* and *George W. Chaney*, for the appellant.

*Fred B. Gentry*, for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Jake Preston Carter filed a claim for compensation with the Industrial Commission, alleging that he had suffered a total loss of vision in his right eye, due to an accident arising out of and in the course of his employment, while working for the Hercules Powder Company. Specifically, his claim was, that while about his employer's business certain chemicals had "splashed" in his right eye, causing a catract to form thereon and resulting in the loss of vision in that eye. The hearing Commissioner found that, assuming that the chemical substance had actually gotten into the claimant's eye (as to which he said there was considerable doubt), the evidence failed to prove a "causal relationship" between the alleged accident and the claimant's loss of vision. The full Commission affirmed this finding and denied the claim. Hence this appeal.

The evidence shows that the claimant, a young man thirty-one years of age, and apparently in good health, was employed in the munition plant of Hercules Powder Company, at Radford, Virginia, and had been so engaged since the middle of February, 1942. In the latter part of May, or the early part of June, 1942, while engaged in his work at the plant, he was standing near an open "mixer" which contained a solution of alcohol, ether and dinitrotoluene. A fellow-employee dropped or threw a large "chunk of powder" into the mixer for the purpose of reconditioning it, and when he did so some of the mixture splashed into the claimant's right eye, causing it to smart or burn. The eye was wiped out by a foreman who directed the claimant to bathe it at the fountain and to have it attended to should it further trouble him. The claimant continued work without reporting the accident to the plant doctor or to the infirmary.

About a week or ten days after this incident the claimant noticed that his right eye seemed to be "blurred" and that

the sight in it was becoming impaired. As the condition did not improve he went to see Dr. Massie, an eye, ear, nose and throat specialist practicing in Roanoke. Dr. Massie examined the claimant on June 16 and sent him to Dr. Walker, a like specialist in the same city.

On July 7, 1942, Dr. Walker wrote Dr. Massie that he had diagnosed the claimant's trouble as cataract. He further stated that the claimant "has had no pain or redness in either eye and his only complaint was of poor vision in the right eye. He stated that in February of 1942, the vision in the right eye was as good as that in the left."

Continuing, Dr. Walker said: "The etiology seems obscure but I believe it is a secondary change from a chronic uveitis of the right eye. He is in contact with numerous chemicals at the place where he is working and the changes present are similar to those found in a dinitrophenol type of cataract. However, this type is practically always bilateral and I was unable to find any suggestion of a change in the left eye."

On July 11 Dr. Massie wrote the claimant concurring in Dr. Walker's diagnosis of cataract. He also adopted Dr. Walker's suggestion that the "etiology seems obscure but could be secondary change from a chronic uveitis", and that the condition was similar to that of a "dinitrophenol type of cataract."

Dr. Massie also wrote that the was unable to say whether the blow which the claimant had received in his right eye "some time ago" was a "predisposing factor" in his present condition.

While Dr. Massie later testified that during his examination of the claimant the latter had said "something splashed into his eye some time before", he made no mention of this occurrence in his written report to the claimant. Neither did Dr. Walker mention this incident. In fact, Dr. Walker wrote that the claimant had said that his trouble in the right eye had "started" "after the patient had had a head cold." Apparently neither the physicians nor the claimant, at that

time, suspected that the eye condition was attributable to the incident.

Dr. Massie was summoned as a witness by both sides and was examined in chief by the Commissioner. He stated that the cataract was not a usual formation but resembled one sometimes seen in a person who had taken dinitrophenol for the purpose of reducing his weight. He was "unable to state" "what effect the one injury would have in causing the cataract". He was of opinion that the cataract "antedated the date of the alleged accident", and that while it "was formed from some chemical", "it was due more to the constant exposure" to the chemical fumes with which the claimant had come into contact during his work around the mixer, than to the single occasion when the solution got into the eye. Why this condition should have resulted in one eye and not in the other, he could not explain.

Dr. Walker, who, as we have seen, examined the claimant in July, was in the Armed Forces and was not available as a witness.

Dr. Hatcher testified that he had examined the claimant on December 11 and 19, at the request of the latter's attorney. Called as a witness for the claimant, he testified that he had never seen or read of a similar case; that the claimant had a "mature cataract" without "any inflammatory signs and without evidence of injury like a penetrating wound", such as "would be caused by a sharp instrument or foreign body." When asked whether, in his opinion, the cataract was caused by the chemical which splashed in the claimant's eye, his answer was, "since I have never seen a case which did, and I could not find any parallel case in the literature, I would be going out on a limb to say whether it did or did not."

Dr. Hatcher further testified that by correspondence he had submitted the claimant's case to several specialists in other cities, and their letters were offered in evidence by the claimant. Each of these physicians wrote that he had not seen or heard of a case of this character.

Dr. Bruner of Cleveland wrote: "I do not see how the substances mentioned in your letter could have produced a cataract in this man's eye without previous inflammatory symptoms and some evidence of external injury."

Dr. Berliner of New York wrote, "I do not see how the case which you mention could show cause and effect."

Dr. Zentmayer of Philadelphia wrote that the fact that the claimant's vision appeared normal at the time he entered the employ of the Hercules Powder Company, in February, 1942, "does not rule out the possibility that he may have had cataract developing at the time."

After the hearing before the Commissioner had been completed, by agreement of both sides and at the suggestion of the Commissioner, the claimant was given a general examination by Dr. Graves of Roanoke, who filed a written report of his findings. Dr. Graves' summary of the claimant's history is this: "Was in excellent physical condition so far as he knew until last May when he accidentally got a caustic solution in his right eye. In June the sight of the eye was definitely worse and it has been failing progressively since. Now he is practically blind in this eye, but states the sight in the left eye seems to be good. He states that at one time the examining physician at the plant where he works found sugar in his urine. His history is otherwise irrelevant."

Dr. Graves further stated that the claimant's "right eye is opaque, left eye appears normal"; that his urinalysis was "negative", and states his conclusion as follows: "Except for the eye condition, this man is in excellent physical condition. Diabetes can be definitely ruled out, and it is very possible that the report of sugar in his urine was due to a clerical error. I can find no evidence of any systemic disease which could account for the eye condition."

The question we have to decide is whether the Commission was bound under this evidence to have found that there was a causal connection between the contact of the chemical solution with the claimant's eye and the formation of the cataract thereon,—that is, does this evidence establish such

causal connection as a matter of law,—or was the Commission justified in inferring from it that the causal connection was not proven?

In approaching the question we must bear in mind certain well-established principles. While the Workmen's Compensation Act is highly remedial and must be liberally construed, the claimant must prove his case. The burden of doing this rests upon him. He must prove a causal connection between the accident and the disability which he claims resulted therefrom. This proof must go beyond conjecture. If the evidence shows that it is just as probable that the disability resulted from a cause which is not com-pensable, as it is that it resulted from one which is com-pensable, the claimant has not sustained the burden of proof. *Campbell & Co.* v. *Messenger,* 171 Va. 374, 377, 379, 380, 199 S. E. 511, 513, 514, and authorities there cited. See also, *Hubbard* v. *Dan Valley Mills, ante,* p. 223, decided at this term.

In *Old Dominion Land Co.* v. *Messick,* 149 Va. 330, 337, 141 S. E. 132, this court, speaking through Judge Campbell, now its Chief Justice, said: "To be compensable, the disease must be produced by the specific injury com-plained of, or if the disease is in existence at the time of the accident, aggravated thereby," and that proof that the dis-ease "may be due to an injury" "is not sufficient."

Again, we must remember that under the provisions of section 61 of the Act (Michie's Code of 1942, sec. 1887(61) ), the Commission's findings of fact when based on evidence deemed by it to be credible, are conclusive and binding on us, and in the absence of fraud are not subject to review. *Burlington Mills Corp.* v. *Hagood,* 177 Va. 204, 208, 13 S. E. (2d) 291, 292. See also, *Blair* v. *Buchanan Coal Corp.,* 171 Va. 102, 105, 198 S. E. 491, 493, and au-thorities there cited; *Hubbard* v. *Dan Valley Mills, supra.*

The case is before us, then, on an issue on which the claimant has the burden of proof, and which the Commis-sion has found he has not sustained. Can we say, as a mat-

ter of law, that the finding is incorrect and should be reversed?

The argument of the claimant runs thus: The testimony of the several "eye specialists" is "in hopeless confusion", and has no probative value one way or the other; the un-contradicted "lay testimony" is that the claimant's eye was in good condition before the accident, and shortly there-after his sight became impaired by the formation of a cataract thereon; a cataract is caused either by disease or by a trauma; since Dr. Graves' report shows that he found "no evidence of any systemic disease which could account for the eye condition", we must conclude that the cataract was caused by the chemical solution which came in contact with the claimant's eye at the time of the accident.

There are several defective links in this chain of reasoning. In the first place, we cannot say that simply because the eye specialists (who, by the way, were phy-sicians of the claimant's own choosing) were unable to say whether the cataract was caused by the chemical solution which got into his eye at the time of the accident, their testimony is without probative value. Certainly it is a fair inference from Dr. Massie's testimony that the cataract was in existence prior to the date of the alleged accident and was not produced by the chemical which got into his eye on that occasion, but was rather due to prolonged ex-posure to the chemical fumes to which the claimant was subject in connection with his work.

We think it is a fair inference to be drawn from Dr. Hatcher's testimony that since there was no penetrating wound, no foreign body in the eye, and no inflammation of the claimant's eye, such as is usually found in traumatic cataracts, this cataract was not due to the contact of the chemical with the eye.

Again, Dr. Walker suggested that the cataract might be due to "chronic uveitis".

While, of course, it is a matter of common knowledge that the eye is sensitive and will smart and burn from con-tact with a caustic chemical solution, and other foreign

objects, cataracts do not ordinarily follow as the result of such experiences. Moreover, there is no testimony whatsoever that a single application of this particular chemical solution will cause or result in a cataract. Indeed, the evidence is to the contrary.

Nor does it follow that because the claimant had not discovered any defect in his eye before the accident, none in fact existed. Dr. Massie, who was, of course, familiar with the claimant's history, was nevertheless of the opinion that the origin of the cataract "antedated" the accident. As Dr. Zentmayer pointed out in his letter to Dr. Hatcher, the fact that the claimant's vision appeared to be normal when he entered the employ of the company in February, 1942, did not "rule out the possibility that he may have had cataract developing at the time." From common experience we know that one may die suddenly without knowing or suspecting that he was afflicted with a mortal disease.

It is true that Dr. Graves' report shows that at the date of his examination of the claimant, on January 26, 1943, he found "no evidence of any systemic disease which could account for the eye condition." What Dr. Graves meant, of course, was that he found no disease in the claimant's general system, or body as a whole, which would secondarily result in the formation of a cataract on his eye. But not being an eye specialist, he does not pretend to say whether the cataract was due to a disease in the eye itself. That a cataract may occur either as a primary or secondary disease of the eye itself is well recognized by the medical profession. See Encyclopaedia Britannica, 14th Ed., Vol. 9, p. 9. It will be recalled that Dr. Walker's report here suggests that the cataract might be due to "a secondary change from a chronic uveitis".

Certainly the Commission was not bound as a matter of law, in the face of the other evidence submitted, to have found from Dr. Graves' report that, eight months before the date of the examination on which the report is based, the claimant was entirely free of any systemic or eye condition which might have caused the cataract. The weight

and sufficiency of such evidence was for the Commission and is not for the appellate court.

On the whole we cannot say that the finding of the Commission is unsupported by the evidence and is wrong. On the contrary we are of the same opinion as the Commission, that the evidence fails to establish a causal connection between the accident and the disability from which the claimant now suffers.

Our conclusion here is not in conflict with that reached in *Ellis* v. *Commonwealth, post,* p. 293, this day decided. In that case there was strong and positive evidence from two attending physicians of a causal connection between the alleged injury and the disability, which we held was not "overcome by the opinion of the non-attending physician, based upon probable or conjectural causes, and qualified with an admission of the lack of certain material information which was before the attending physicians." As Mr. Justice Spratley aptly said, in distinguishing that case from this: "In the *Carter Case,* there was no testimony whatever that cataract on the claimant's eye was due to a chemical solution which came in contact with his eye during employment. The evidence was to the contrary."

Nor does our present conclusion conflict with that reached in *Byrd* v. *Stonega Coke, etc., Co., ante,* p. 212, decided at this term of court. There the question was whether the excessive heat to which the employee was exposed by reason of the nature of his work was the cause or a contributing cause of his death. There some of the physicians were of opinion that the employee's death was due entirely to heart disease, while others thought that the extreme heat caused or contributed to his death. We held that in view of the fact that the employee was apparently a strong and healthy man and died suddenly while he was at work, there was a presumption that death was caused or contributed to by the hazard to which he was exposed in his work, and that this presumption was not overcome by the conflicting medical testimony.

██ ██ That case dealt with a situation in which we know from common experience, and aside from medical testimony, that there is a causal connection between exposure to excessive heat and death. Men who are exposed to such conditions often die because of them. One may indulge in the presumption that a certain result has followed from a particular state of facts, when he knows that like results frequently follow from such conditions. Such a presumption, we held, tilts the scales in favor of the employee in a case where the medical testimony is conflicting and doubtful. See *Winchester Milling Corp.* v. *Sencindiver*, 148 Va. 388, 399, 138 S. E. 479.

██ Here we do not know from our common experience that a cataract will form on the human eye because of its contact with this or any other chemical solution. There is, then, no basis for a presumption that that which is usual or is to be expected has occurred here. Nor is this a case of adding a presumption to evidence which is favorable to the claimant, for, as we have seen, there is no testimony whatever that the cataract was due to the chemical solution which came in contact with the claimant's eye.

The award is

*Affirmed.*