# Richmond

## Walsh Construction Company et al. v.
## Lewis P. London.

March 15, 1954.

Record No. 4214.

Present, All the Justices.

The opinion states the case.

*Gentry & Locke,* for the appellants.

*Walter H. Scott,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

Lewis P. London filed a claim for compensation with the Industrial Commission, alleging that he had suffered a total loss of vision of his left eye as the result of an accident arising out of and in the course of his employment by Walsh Construction Company and Ralph E. Mills Company. After a hearing before a deputy, Commissioner M. E. Nuckols, Jr., entered an award of compensation for a "total loss of the vision" of the eye, under Code, sec. 65-53(16). The full Commission, with Commissioner W. H. Nickels, Jr., dissenting, affirmed, and the employers and insurance carrier have appealed.

The contention of the appellants that the evidence is insufficient to support the finding, either that the claimant's eye was injured in an industrial accident or that there was causal relationship between the alleged injury and the subsequent loss of vision, requires a review of the evidence.

The record shows that on October 2, 1950, the claimant, who was then sixty-four years of age, was employed as a power shovel operator in the construction of a railroad track in Botetourt county. Because of a break down in the equipment which he was operating, the claimant was assigned

to the duty of relief foreman and stationed near another power shovel which was discharging dirt and broken stone into a truck. He testified that during this operation some particles of dust or dirt got into his left eye and while he succeeded in removing some of them with a handkerchief, the eye continued to trouble him during the remainder of the shift. The next morning, as he said, "the eye was stuck together," he bathed it with boric acid solution, and reported the incident to his employers' "first-aid office," but did not on that day seek medical attention. Pending the completion of repairs to the equipment which he had been operating the superintendent suggested that he stop work for a week or ten days, and this he agreed to do with the intention of returning to his home in Asheville, North Carolina.

On October 6 claimant consulted Dr. Edgar N. Abram, an optometrist in Roanoke, who had fitted him with glasses several months previously. Dr. Abram found that the left eye was "inflamed," but since treatment for such condition was not within the scope of his practice he referred him to Dr. Mortimer H. Williams, a local specialist. While Dr. Williams found that the eye was "acutely inflamed," he was unable to find any foreign substance in it. He irrigated the eye with boric acid solution and gave the claimant a prescription for "drops" to be used.

Although Dr. Williams did not so state in either of his written reports, the claimant testified that the doctor told him at the time of the examination that "the eye was torn, all cut up."

On October 11 claimant consulted Dr. E. E. Moore, a specialist at Asheville who found that he was suffering from "a severe uveitis" but that there was "no evidence of retained foreign body" in the eye. However, as this physician subsequently reported, the condition "failed to respond favorably to all forms of treatment," secondary glaucoma developed, and on December 15 the eye was removed.

On November 13, 1952, the claim for compensation was heard by a deputy commissioner, at which time the several

written reports of the three physicians, Drs. Abram, Williams and Moore, were offered in evidence. In their reports neither Dr. Abram nor Dr. Williams expressed an opinion as to causal connection between the fact that foreign substance had gotten into the eye and the condition which thereafter developed and necessitated its removal.

In his report to the claimant's employers, under date of March 2, 1951, Dr. Moore, who had removed the eye, expressed no opinion as to such causal connection. However, on April 11, he wrote counsel for the insurance carrier that "I know of no way to evaluate the relationship between the original injury and the eye when I saw him." On May 3 Dr. Moore wrote the same counsel that "In my opinion there is no relationship between Mr. London's original eye injury and the uveitis which developed in back of the eyeball."

The claimant testified that although prior to the accident he had impaired vision in the eye this had been corrected to normal by glasses which Dr. Abram had prescribed; that previously the eye had given him no trouble; and that immediately following the accident trouble developed and became progressively worse until the eye was removed. The medical reports are to the same effect.

Furthermore, the evidence shows that an examination of the eye after its removal failed to disclose any malignancy or other disease which might have caused the uveitis and glaucoma which necessitated its removal. A blood test of the claimant for syphilis, sometimes a cause of uveitis, was negative.

Shortly after the claim had been heard by the deputy commissioner, but before a decision had been reached, the claimant was directed by a letter from Commissioner Nuckols to report to Dr. J. Fulmer Bright, the Commission's medical advisor at Richmond, for further examination. A copy of this letter which was sent to counsel for the insurance carrier stated that "Both the claimant and the defendant may, if they so desire, have present at the time of this examination a physician of their choice." Later the com-

missioner wrote counsel for both parties of the time and place at which the examination would be made. While counsel for the respective parties made no objection to the proposed examination, neither took advantage of the commissioner's suggestion that either or both might have a medical representative present at the examination.

After the claimant had been examined by Dr. Bright he was referred to Dr. DuPont Guerry, III, a specialist at Richmond, for further examination. Under date of January 6, 1953, Dr. Guerry reported to the Commission as follows:

"I have recently seen Mr. Lewis P. London and have also reviewed his record in order that I could render an opinion in regard to his claim against the Walsh Construction Company and Ralph E. Mills Company. The point at issue is whether or not the loss of his left eye came about as a result of the foreign material which blew into his left eye while he was at work on October 2, 1950.

"It seems to me that it has been adequately shown that the accident did occur and that up until the time of the accident the patient's left eye had useful vision with correction and was completely free from inflammation. In my opinion the injury sustained as a result of foreign material having blown into the eye could and did result in sufficient injury to the cornea for uveitis and secondary glaucoma to develop and this in turn led to enucleation of the eye. It is a well known fact that foreign material entering the conjunctival sac can give rise to corneal lacerations of such severity that uveitis results. The sequence of events in this particular instance is such that I do not see how the uveitis could be explained on any other basis, and, to my mind, the only logical conclusion that can be reached is that the uveitis and secondary glaucoma did result from the accident."

Similarly, Dr. Bright wrote the Commission, under date of January 8, 1953, that from his examination of the claimant and the history of the case he was of opinion that "there is direct causal connection" between the industrial accident and the removal of claimant's eye.

There is no merit to the appellants' contention that the evidence is insufficient to support a finding that there was an industrial accident—that is, that the claimant's eye was injured by some foreign substance. The argument is, as we understand it, that the claimant's positive testimony that foreign substance got into his eye should have been disregarded by the Commission because, it is said, it is uncorroborated. We are aware of no principle of law to support the contention that a finding of fact may not be predicated upon the credible but uncorroborated testimony of an injured claimant. The testimony of the claimant as to how the accident occurred and the particles of dust or dirt got into his eye is not inherently incredible. On the contrary, his story that when the load from the shovel was dumped into the truck the wind blew the dust or dirt in his face and some particles got into his eye, fully accords with human experience.

But aside from this, there is evidence which corroborates that of the claimant. Two coemployees on the job testified that they saw the occurrence and observed the claimant trying to remove the substance from his eye. Moreover, it is undisputed that before the incident the claimant's eye was uninjured, that immediately thereafter it became inflamed, and that he sought medical attention because of it. The fact that neither of the physicians was able to find any foreign substance in the eye does not conclusively prove that it had never been there.

Next, as to causal connection. While the burden was on the claimant to prove causal connection between the alleged injury and the loss of his eye, proof beyond a reasonable doubt was not required. A preponderance of the evidence was sufficient. *Carter* v. *Hercules Powder Co.*, 182 Va. 282, 28 S. E. (2d) 736; *Byrd* v. *Stonega Coke & Coal Co.*, 182 Va. 212, 221, 28 S. E. (2d) 725, 729.

The report of Dr. Guerry, a recognized authority in the field of ophthalmology, which has been quoted in full, clearly and forcefully points out that the presence of

"foreign material" in the eye "could and did result in sufficient injury to the cornea for uveitis and secondary glaucoma to develop and this in turn led to enucleation of the eye." As has been said, Dr. Bright concurred in this opinion.

On the other hand, Dr. Moore, the Asheville physician who treated the claimant in October, 1950, and later removed the eye after having written counsel for the insurance carrier on April 11, 1951, in substance, that he was uncertain about the matter, later wrote him on May 3 that he had reached the conclusion that there was "no relationship" between the "original eye injury and the uveitis." No doubt this evident uncertainty in the mind of the attending physician prompted the Commission to seek further medical evidence on the subject.

The appellants argue that the opinion of Dr. Moore, the attending physician who saw the claimant shortly after the accident and performed the operation for the removal of his eye, is of greater probative value than the opinions of Drs. Guerry and Bright who examined the claimant some two years yater. But it was the function of the Commission to evaluate the conflicting views of the medical experts, and its finding on the issue of fact is binding on us.

■ Complaint is made of the action of the hearing commissioner in directing the claimant to appear for examination at Richmond after the evidence had been taken before the deputy hearing commissioner and in considering the reports of such examinations. At the time the examination was proposed and made the matter was still pending before the hearing commissioner and there had been no adjudication thereon. Clearly, we think, such examination was within the purview of Code, § 65-87, which authorizes the Commisssion "upon its own motion" to "appoint a disinterested and duly qualified physician or surgeon to make any necessary medical examination of the employee and to testify in respect thereto."

Moreover, the rights of the parties were protected. Coun-

sel were notified of the time and place of the proposed examination and given the opportunity of having a physician of their choice present. Neither side objected or took advantage of this offer or asked the privilege of cross-examining Dr. Guerry or Dr. Bright. In accordance with the usual practice of the Commission, the written reports of these physicians were considered along with those of the others. None of the doctors was called to testify. Not until the reports of the Richmond physicians turned out to be adverse to their interests did the appellants object to the procedure. Plainly such objection came too late.

The evidence shows that prior to the accident the claimant, from natural causes, had suffered a reduction in the vision of the eye to 20/200, which is tantamount to a total loss of vision, but by the use of glasses such defective vision had been corrected to 20/20, or normal. The appellants contend that under such circumstances the measure of the claimant's loss must be determined by the condition of the eye without the "artificial aid of glasses," and that since without glasses he was "industrially blind" in the eye, he is not entitled to an award under Code, § 65-53(16), on the basis that he suffered a total loss of vision in the accident. The award, the appellants say, should be "for a percentage of facial disfigurement" under Code, § 65-53(19).

On the other hand, the appellee claimant contends, and the Commission held, that in this industrial accident he was deprived of corrected vision, and that that is the basis for determining whether compensation and the amount thereof should be paid him. We agree with this latter view.

Code, § 65-53(16), provides for the payment of compensation to an injured employee, measured by a percentage of his average weekly wages, "for the permanent total loss of the vision of an eye." Since the section is silent as to whether corrected or uncorrected vision should be the basis for determining the extent of eye injuries, it should be interpreted and applied in a practical and common-sense manner so as to accomplish the purposes of the act.

It is a matter of common knowledge that many employees in industry are "industrially blind" without the aid of glasses and yet with such aid are just as efficient in their work as those whose vision needs no correction. The framers of the act are presumed to have known this. It would, we think, be quite unreasonable and entirely unmindful of the realities of life to say that it was the purpose of the act to deny compensation to an employee for the total loss of vision in an eye which, although defective from natural causes, had been restored to its normal use by a simple and commonly used appliance.

Here, prior to the injury, the claimant employee had normal vision and was able to perform his work satisfactorily. His corrected vision was just as valuable to him and to the industry in which he was engaged as the unimpaired vision of his coemployees. As the result of this industrial accident he has lost the source of his vision and all means of correcting the eye to normal use. It is compensation for such loss which the act contemplates should be paid to him and borne by the industry in which he was employed.

The question with which we are here concerned has frequently been before the courts of other States and the decisions are in conflict. See annotations in 8 A. L. R. 1324, 24 A. L. R. 1467, 73 A. L. R. 708, 99 A. L. R. 1502, 142 A. L. R. 825. Our view is in accord with the majority and that of the better-reasoned cases. A full and illuminating discussion of the subject is found in *Lambert* v. *Industrial Commission*, 411 Ill. 593, 104 N. E. (2d) 783. See also, *Schrum* v. *Catawba Upholstering Co.*, 214 N. C. 353, 199 S. E. 385.

In our opinion the award is plainly right and accordingly it is

*Affirmed.*