## THE AMERICAN ASSOCIATION OF BREEDERS OF HOLSTEINER HORSES, INC.

v.

## WERNER LATTREUTER

Record No. 841208

November 25, 1987

Present: All the Justices

*Andrew H. Perkins (Perkins, Price and Zimmerman*, on briefs), for appellant.
*Peter W. Buchbauer (Douglas M. Swift, Jr. P.C.*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

Werner Lattreuter, a foreign national, sued the American Association of Breeders of Holsteiner Horses, Inc. ("Association"), for breach of two separate but virtually identical contracts to sell Lattreuter two groups of fifty pregnant heifers. The first contract was dated June 24, 1980; the second was dated September 22, 1980. Lattreuter contended, in a jury trial, that the Association failed to deliver pregnant heifers and improperly charged for feed for the nonconforming cattle. Lattreuter sought to recover his purchase price of $72,500 and the feed cost of $13,900. He prevailed. Judgment was entered on a jury verdict in his favor in the amount of $74,085.74. This amount represents a full recovery of the claimed items of damages less $12,341.26, which he had already received from the Association. The Association appeals.

On appeal, the Association makes several assignments of error. Among these is the Association's contention that Lattreuter failed to prove breach of contract by establishing, as pleaded, that the cattle were *not* pregnant when delivered. Because we agree that Lattreuter failed to prove breach of contract, we need not discuss any other assignments of error.

The two contracts provided in pertinent part as follows:

Herr Lattreuter has purchased fifty heifers out of the AAoBoHH Angus herd. Fifty heifers are to be selected out of the best cows and are to be delivered safe, pregnant, and free from any other costs.

Purchase price is $725 per head. When payment has been made, the fifty heifers will be transferred over to the total ownership of Herr Werner A. Lattreuter.

The AAoBoHH will have the total responsibility for the care, feeding, vaccinating, etc. of the particular herd. Profit will be split annually, 55%-45%, the higher being in favor of the AAoBoHH.

Finally, if at any time Herr Lattreuter so desires, he has the option to increase the size of his herd or sell any amount of his herd.

Shortly after signing each contract, Lattreuter made the necessary payments of $36,250 per contract.

In February 1983, the Association sued Lattreuter to enforce a stable lien for board fees and other expenses related to horses owned by Lattreuter then in the care of the Association. Lattreuter answered and filed a cross-bill setting forth his claim regarding the cattle. As indicated above, he contended in his pleading that the Association breached its contracts by failing to deliver pregnant heifers.

At trial, Lattreuter and Emil-Bernard Jung, president of the Association, were the only witnesses to testify about whether the cows were pregnant at the time of delivery under both the June 1980 and September 1980 contracts. Lattreuter, the plaintiff, testified as follows on this issue: He said, on direct testimony, that at the time he entered each contract Jung told him "these animals were pregnant." On cross-examination, he again said that Jung told him that the cows were pregnant. He went on to say that he assumed "that these cattle were pregnant."

Lattreuter returned to the stand later in the case and was asked whether he ever asked anyone whether his cattle were pregnant. He replied as follows: "I presupposed that they were pregnant, because that is what it says in the contract." Moreover, on a visit to the farm in the summer of 1981, he saw calves in the herd but he did not ask whether they belonged to him.

Lattreuter called Jung as an adverse witness. Jung was also questioned about whether the cows were pregnant at the time they were delivered to Lattreuter. The following exchange occurred:

Q. Okay. The heifers identified in those contracts: were they pregnant at the time of the making of the respective contracts?

A. When the final examination of pregnancy, or selection, was after the second contract was signed a few days later after that.

Q. So, you are saying then that the verification of pregnancy of the cattle purchased in June was not ascertained until after September 22nd, 1980: is that correct?

A. Those heifers were bred. There were four sires, four bulls, in the herd with those heifers, and the final examination took place two days after the second contract was signed.

. . . .

Q. [T]he heifers purchased in June were not pregnant at the time they were paid for: is that correct?

. . . .

A. *They were pregnant.* There was a bull with those heifers and you can't make a pregnancy check that early. I mean . . . rectal examination. So, they were pregnant at that time because there were the bulls, and there was no indication that they were not pregnant.

. . . .

Q. So, your testimony today is that the heifers purchased in June and September were pregnant: is that correct?

A. *That is correct.*

(Emphasis added.)

After the foregoing exchange, Lattreuter's counsel attempted to impeach Jung with deposition testimony where Jung was asked "were they pregnant?" and his response was "No." However, Jung explained that when he made that remark he was not talking about the same cattle. He said "that is taking [sic] out of context. I was talking about the second group . . . I was not talking about the first group."

Jung was next asked the following question: "Were any calves born to the pregnant heifers which were purchased by Mr. Lattreuter in 1980?" Jung gave this response:

*We traded those heifers,* his pregnant heifers, into . . . young heifers, *so I don't know.* I don't know if any calves

were born because they kept . . . the cows, the heifers were sold and at the other place where they went to, but that is out of my knowledge.

(Emphasis added.)

At the close of plaintiff's case, the Association's counsel moved to strike plaintiff's evidence. He argued that the only alleged basis of breach was failure to deliver "fifty pregnant heifers." The Association's counsel pointed out Lattreuter *did not testify* that he *did not* receive pregnant cows and that Jung testified that the cows were pregnant. Given this testimony, the Association's counsel argued that a prima facie case of breach of contract had not been established. The trial court denied the motion to strike. It reasoned that a prima facie case of breach had been established and explained its ruling as follows: "I think it is a pretty strong inference when there is no evidence that the cattle had calves that they must not have been pregnant." The Association's counsel questioned the basis for the trial court's conclusion and this exchange occurred:

> THE COURT: A prima facie case is made out on it in that pregnant cattle were contracted for and there is no evidence that any pregnant cattle were ever delivered.
>
> [THE ASSOCIATION'S COUNSEL]: Your Honor, there is the testimony of Mr. Jung that they were pregnant and segregated. There is no testimony to refute that.
>
> THE COURT: Except the nonexistence of any calves.

■ The motion to strike should have been granted. The burden was upon Lattreuter to prove his claim of breach of contract on the basis of failure to deliver pregnant cattle. Significantly, Lattreuter did not testify that the Association failed to deliver pregnant cattle. To the contrary, Lattreuter testified that he was told the cows were pregnant and that he assumed they were pregnant. Such testimony is plainly insufficient to establish that the cows were *not* pregnant.

■ This means that Lattreuter's proof of breach must rise or fall with Jung's testimony. Jung was called as an adverse witness. His testimony was binding on Lattreuter unless it was in conflict with other evidence introduced by the plaintiff. *See Horne* v. *Milgrim*, 226 Va. 133, 139, 306 S.E.2d 893, 896 (1983). Jung testi-

fied that the cows were pregnant at the time they were delivered to Lattreuter. At no place does Lattreuter adduce contrary evidence.

Lattreuter argues, however, that the jury was entitled to infer from Jung's testimony that the cows in question were not pregnant because there was no proof that calves were ever born of these cows. In advancing this argument, Lattreuter relies on *Carter* v. *Hercules Powder Co.*, 182 Va. 282, 28 S.E.2d 736, (1944), an industrial commission case in which the claimant sought to prove that a cataract resulted from exposure to chemicals at work. There, in ruling against the claimant, we noted that, "[o]ne may indulge in the presumption that a certain result has followed from a particular state of facts, when he knows that like results frequently follow from such conditions." *Id.* at 292, 28 S.E.2d at 740.

The principle announced in *Carter* does not come into play in this case. There is no testimony in the instant case that calves were never born to the cows that had been originally sold to Lattreuter. Jung simply said that he did not know whether calves were born to those cows because those cows had been sold and taken away. It would be a distortion of *Carter* and quite illogical to have a witness testify positively that cattle were pregnant, yet to permit the opposite inference simply because the same witness had no knowledge whether calves were born to the cows in question.

Lattreuter framed the issues in his case against the Association. He was required to prove his case of breach of contract. Without such proof he was not entitled to recover. We hold that the trial court erred in failing to grant the Association's motion to strike Lattreuter's evidence of breach of contract. We will, therefore, reverse the judgment of the trial court and enter final judgment in favor of the Association.

*Reversed and final judgment.*