COURT OF APPEALS OF VIRGINIA

Present:   Judges Frank, Clements and Senior Judge Fitzpatrick
Argued at Richmond, Virginia


VIRGINIA NATURAL GAS, INC. AND
  AGL RESOURCES

v.      Record No. 2152-06-1

CLINTON TENNESSEE                                          OPINION BY
                                               JUDGE JEAN HARRISON CLEMENTS
CLINTON TENNESSEE                                       AUGUST 21, 2007

v.      Record No. 2331-06-1

VIRGINIA NATURAL GAS, INC. AND
  AGL RESOURCES


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Robert A. Rapaport (Kira A. Ligto; Clarke, Dolph, Rapaport,
        Hardy & Hull, P.L.C., on briefs), for Virginia Natural Gas, Inc. and
        AGL Resources.

        John H. Klein (Charlene A. Morring; Montagna Klein Camden,
        L.L.P., on briefs), for Clinton Tennessee.


        The parties each appeal from the August 11, 2006 opinion of the Workers' Compensation

Commission (commission) awarding Clinton Tennessee (claimant) permanent partial disability

benefits based on a 37% permanent partial impairment rating for his right leg and denying his

claim for temporary partial disability benefits because he failed to prove he adequately marketed

his residual work capacity.  In their appeal, Virginia Natural Gas, Inc. and AGL Resources

(collectively, employer) contend the commission erred in awarding claimant permanent partial

disability benefits based on the inclusive 37% impairment rating rather than the 18.5% rating

specifically attributable to claimant's compensable injury.  In his appeal, claimant contends the

commission erred in finding he did not carry his burden of proving he adequately marketed his residual work capacity. Finding no error, we affirm the judgment of the commission.[1]

## I. BACKGROUND

The relevant facts in this case are not in dispute. On February 4, 2002, while working for employer as a utility mechanic, claimant sustained a compensable injury by accident when he stepped in a hole and twisted his right knee. The next day, claimant sought medical treatment at an urgent care facility, which restricted him to light duty work and referred him to Dr. Richard Holden, an orthopedist.

On February 7, 2002, Dr. Holden treated claimant for a "mild strain of the right knee." Dr. Holden noted that claimant had a history of "aches and pains and stiffness in his knee for some time" and that claimant's x-rays showed "profound degenerative arthritis" of a longstanding nature. Dr. Holden continued claimant on pain medication and released him to full duty work.

Claimant returned to Dr. Holden on May 6, 2004, seeking relief for "pain in his right knee" that made it difficult for him to sleep, walk, and stand. Reporting that claimant had a history of "significant arthritis of both knees" and that claimant's x-rays revealed "end stage arthritis," Dr. Holden referred claimant to Dr. A.J. DiStasio, II, for a total knee replacement.

Claimant saw Dr. DiStasio on May 26, 2004, at which time the doctor noted as follows:

> Mr. Tennessee is a 55-year-old gentleman who presents for
> evaluation of treatment of worsening right knee pain. While in a
> duty status on 2/4/02 he stepped in a hole sustaining a twisting
> injury to the right knee. There was immediate swelling and he has
> had persistent medial pain and stiffness since that time. . . . He is
> in essentially constant pain and notes frequent swelling of the right
> knee. He reports locking but no giving way. Symptoms are
> aggravated by any type of prolonged standing or walking,

---

[1] Because these separate appeals involve common facts and proceedings, we consolidate them for purposes of this decision. See Bennett v. Commonwealth, 8 Va. App. 228, 229 n.1, 380 S.E.2d 17, 18 n.1 (1989).

prolonged sitting, squatting, bending, etc. There [are] no specific relieving factors.

Dr. DiStasio also noted that claimant had "an underlying history of right knee problems and had a right knee arthroscopy in 1991 for treatment of a medial meniscus tear" and that x-rays of claimant's right knee showed "tri-compartmental arthritic changes with some chondral sclerosis joint space narrowing and osteophytes." The doctor assessed claimant's condition as "[r]ight knee arthritis, exacerbated by worker's compensation injury of 2/04/02."

In a follow-up history dictated June 20, 2004, Dr. DiStasio noted that, after the knee arthroscopy in 1991, claimant "returned to full duty and did well until his recent injury on 2-4-02." Dr. DiStasio further noted that claimant received physical therapy and medication after the injury but was now experiencing "constant pain and frequent swelling of the right knee" with some locking.

Dr. DiStasio performed total knee replacement surgery on claimant's right knee on June 30, 2004. Claimant was awarded medical benefits and temporary total disability benefits from June 30, 2004, to September 6, 2004, based on his pre-injury average weekly wage of $860.40.

Upon his return to work with employer, claimant was restricted to "sedentary duties only." On March 18, 2005, Dr. DiStasio imposed permanent work restrictions prohibiting claimant from heavy lifting, stooping, kneeling, and crawling. Under the restrictions, claimant was allowed to sit, lift up to 20 pounds, twist, reach, grasp, perform repetitive movement, and drive without limitation. The restrictions further permitted claimant to stand, walk, climb stairs, and bend for 3 to 5 hours at a time. Claimant continued working for employer until June 1, 2005, at which time employer informed him that it no longer had suitable light duty work available for him.

Within two weeks after his light duty work with employer ended, claimant, who had been with employer as a utility mechanic for 18 years, registered with the Virginia Employment

Commission (employment commission). The employment commission gave claimant a list of four job opportunities. Claimant contacted each of the employers on the list. One of the jobs required heavy lifting, which was not permitted by his work restrictions. He applied for the other three jobs that were within his work restrictions. He was told that, between his retirement and workers' compensation benefits, he was paid too much to qualify for one of the jobs, and he never heard back from another. He accepted the remaining position, the only one offered to him, as a van driver and started working on August 15, 2005. After obtaining the job as a van driver, claimant discontinued his job search.

Claimant earned $7 an hour in his new job and averaged approximately $250 per week in earnings. The job was "a part-time position." Claimant worked approximately six hours a day driving the van but sometimes got "a little extra time . . . to do some other work," but not every day. Some weeks, he worked more than 40 hours, but, overall, averaged less than 36 hours per week.

On August 11, 2005, Dr. DiStasio executed a form stating as follows:

> With regard to [claimant], it is my opinion, to a reasonable degree of medical certainty, that:
>
> [Claimant] reached maximum medical improvement as of March 18, 2005.
>
> [Claimant] has a 37% permanent partial impairment rating to the right lower extremity as a result of his February 4, 2002 work-related injury. Of that percentage, 50% is attributable to his pre-existing arthritic condition.

On November 14, 2005, the deputy commissioner conducted a hearing on claimant's application for "an award of compensation for temporary total disability from June 1 to August 14, 2005; temporary partial disability from August 15, 2005, and continuing; and permanent partial disability for an alleged 37% loss of use of his right leg." Employer defended the claim on the grounds that "claimant's loss of use related to [the industrial] accident was 18.5% and that

- 4 -

. . . claimant had failed to market his residual capacity." Following the presentation of evidence, the deputy commissioner awarded claimant permanent partial disability benefits based on an 18.5% permanent partial impairment rating and denied claimant's request for temporary total and temporary partial disability benefits because he failed to market his residual work capacity. Claimant appealed the deputy commissioner's reduced award of permanent partial disability benefits and denial of temporary partial disability benefits.

Finding, on review, that the evidence was "sufficient to support an award for scheduled loss under Code § 65.2-503 based on the 37 percent [permanent partial impairment] rating to the right leg assigned by the claimant's treating physician," the full commission reversed the deputy commissioner's award of permanent partial disability benefits based on the 18.5% rating. In reaching that decision, the commission noted as follows:

> Dr. DiStasio, the claimant's treating orthopedist, indicated that the claimant sustained a 37 percent permanent partial impairment rating to the right lower extremity "as a result of his February 4, 2002, work-related injury." He then confusingly related 50 percent of the rating to the claimant's "pre-existing arthritis condition." We resolve this ambiguity by reference to other medical reports. Dr. DiStasio's initial diagnosis was right knee arthritis "exacerbated" by the work injury. He also reported that the claimant had done well until the work injury, after which he was in constant pain.

> Although the claimant clearly had arthritis in his knee before the industrial injury, we do not find any persuasive evidence of a pre-existing functional loss. Accordingly, we cannot find that the claimant had a pre-existing percentage loss of use prior to the accident which can be reasonably deducted from the claimant's award.

Also finding claimant failed to carry his burden of proving he marketed his residual work capacity, a majority of the full commission affirmed the deputy commissioner's denial of the requested temporary partial disability benefits.

These appeals followed.

- 5 -

## II. PERMANENT PARTIAL IMPAIRMENT RATING

On appeal, employer does not dispute the commission's finding that Dr. DiStasio diagnosed that claimant's February 4, 2002 injury by accident "exacerbated" claimant's existing arthritic condition in his right knee or that Dr. DiStasio indicated that claimant "sustained a 37 percent permanent partial impairment rating to the right lower extremity 'as a result of his February 4, 2002, work-related injury.'" Rather, employer solely contends that, unlike the deputy commissioner, who reduced claimant's permanent partial impairment rating from 37% to 18.5% based on Dr. DiStasio's opinion that half of the 37% rating was attributable to claimant's pre-existing arthritic condition, the full commission improperly failed to account for that portion of Dr. DiStasio's opinion. Employer argues that, based on Dr. DiStasio's opinion, the commission should have given it a credit for the 18.5% impairment causally related to the pre-existing disability to claimant's right leg. Thus, employer concludes, the commission erred in awarding claimant permanent partial disability benefits based on the entire 37% impairment rating assigned by Dr. DiStasio rather than the 18.5% rating the doctor specifically attributed to claimant's compensable injury. We disagree.

"Under well recognized principles governing the standard of review on appeal, we must affirm the commission's judgment awarding [permanent partial disability] if those findings are supported by credible evidence in the record, regardless of whether contrary evidence exists or contrary inferences may be drawn." Rusty's Welding Service, Inc. v. Gibson, 29 Va. App. 119, 131, 510 S.E.2d 255, 261 (1999) (en banc) (citing Code § 65.2-706(A)). "In determining whether credible evidence exists, [we do] not retry the facts, reweigh . . . the evidence, or make [our] own determination of the credibility of the witnesses." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). Moreover, "we must view the evidence in the

light most favorable to [claimant,] the party who prevailed before the commission" on this issue. K & K Repairs & Constr. v. Endicott, 47 Va. App. 1, 6, 622 S.E.2d 227, 229 (2005).

"Code § 65.2-503 of the Virginia Workers' Compensation Act generally deals with compensation for permanent loss." Georgia-Pacific Corp. v. Dancy, 255 Va. 248, 249, 497 S.E.2d 133, 133 (1998). Code § 65.2-503(B) "provides a schedule of benefits for the loss of specific body parts," Stanfield v. City of Hampton Fire & Rescue, 31 Va. App. 240, 241, 522 S.E.2d 404, 405 (1999), including the loss of a leg, see Code § 65.2-503(B)(13). Code § 65.2-503(D) provides, in pertinent part, that, "[i]n construing this section, the permanent loss of the use of a member shall be equivalent to the loss of such member, and for the permanent partial loss or loss of use of a member, compensation may be proportionately awarded." Hence, "a numerical rating [of the permanent partial loss of use of the injured body part] is required so that benefits may be proportionally awarded according to the percentage loss and determined by the schedule in Code 65.2-503(B)." Hill v. Woodford B. Davis Gen. Contractor, 18 Va. App. 652, 654, 447 S.E.2d 237, 237-38 (1994) (citing County of Spotsylvania v. Hart, 218 Va. 565, 568, 238 S.E.2d 813, 815 (1977) (requiring the commission to rate "the percentage of incapacity suffered by the employee" before awarding permanent partial benefits)).

> The commission, in determining permanent partial disability benefits, must rate claimant's percentage of incapacity based on the evidence presented to it. In doing so, it gives great weight to the treating physician's opinion. If there is any doubt in the treating physician's opinion, or if there is contrary expert medical opinion, "the commission is free to adopt that which is most consistent with reason and justice."

United Airlines, Inc. v. Sabol, 47 Va. App. 495, 501-02, 624 S.E.2d 692, 695 (2006) (citations omitted) (quoting Williams v. Fuqua, 199 Va. 709, 714, 101 S.E.2d 562, 567 (1958)).

In this case, the only evidence in the record supporting an award of permanent partial disability benefits under Code § 65.2-503(B) and 65.2-503(D) was provided by claimant's

treating orthopedic surgeon, Dr. DiStasio, who stated that claimant had "a 37% permanent partial impairment rating to the right lower extremity as a result of his February 4, 2002 work-related injury." Dr. DiStasio further stated that, "[o]f that percentage, 50% [was] attributable to [claimant's] pre-existing arthritic condition." Employer argues that the latter statement of Dr. DiStasio relieves it from liability for that half of the overall 37% impairment rating that was attributable to claimant's arthritic condition, which pre-existed the industrial accident. See Virginia Fibre Corp. v. Moore, 17 Va. App. 691, 693, 440 S.E.2d 432, 434 (1994) (recognizing that Code § 65.2-505 "relieves an employer from liability for that portion of a compensable injury that pre-existed" the industrial accident).

Employer's argument, however, runs counter to the principle set forth in United Airlines, Inc. that an employer is entitled to a credit for a pre-existing condition or defect only if the "evidence show[s] that the claimant suffered a pre[-]existing *functional loss*" of use. 47 Va. App. at 502-03, 624 S.E.2d at 695 (internal quotation marks omitted); cf. Virginia Fibre Corp., 17 Va. App. at 692, 440 S.E.2d at 433 (citing Walsh Constr. Co. v. London, 195 Va. 810, 818, 80 S.E.2d 524, 528 (1954)), for the proposition that, in determining permanent partial disability benefits, "where a pre-existing injury to or disability in a sense organ did not materially affect the employee's overall ability to use the organ, no benefit would accrue to the employer for any pre-injury disability to the organ" and declining to allow the employer a credit for the claimant's measurable pre-existing hearing loss because that loss was not shown to have materially affected his ability to use his hearing). In other words, for purposes of determining permanent partial disability benefits under Code § 65.2-503(B) and 65.2-503(D) for an employee's permanent partial loss of use of a body part, the commission may deduct that portion of an impairment rating attributable to a pre-existing condition or defect in the body part only where it is shown that the employee suffered a permanent pre-existing functional loss of use of

- 8 -

that body part as a result of the pre-existing condition or defect. Thus, where no permanent pre-existing functional loss of use of the body part is shown, the commission may not allow the employer a credit for a condition or defect that pre-existed the compensable injury.

Here, the commission acknowledged that "claimant clearly had arthritis in his knee before the industrial injury" and that Dr. DiStasio opined that half of the 37% rating was attributable to claimant's pre-existing arthritic condition. Applying the aforementioned principle set forth in United Airlines, Inc., however, the commission determined it could not reduce claimant's impairment rating from 37% to 18.5% based on Dr. DiStasio's opinion because there was no evidence in the record showing that claimant suffered a permanent pre-existing functional loss of use of his right leg as a result of the arthritic condition.

The record supports the commission's determination. Indeed, nothing in the record indicates that claimant experienced any permanent functional loss of use of his right leg prior to the compensable injury on February 4, 2002. There is no evidence, for instance, that he was ever diagnosed with a permanent impairment, given a permanent impairment rating, or placed under any permanent work restrictions before the compensable injury. To the contrary, Dr. DiStasio specifically noted that, after claimant's prior knee surgery in 1991, claimant "returned to full duty and did well until" the compensable injury. Moreover, the record establishes that the symptomatic limitations that ultimately necessitated the total knee replacement surgery did not arise until after, as Dr. DiStasio noted, the injury by accident "exacerbated" the pre-existing arthritic condition.

Because there was no evidence presented that showed claimant suffered a permanent pre-existing functional loss of use of his right leg, employer was not entitled to a credit for claimant's pre-existing arthritic condition. See United Airlines, Inc., 47 Va. App. at 502-03, 624 S.E.2d at 695. We hold, therefore, that the commission did not err in refusing to allow employer

- 9 -

such a credit and in awarding claimant permanent partial disability benefits based on the entire 37% impairment rating assigned by claimant's treating orthopedic surgeon.

### III. MARKETING RESIDUAL WORK CAPACITY

In his appeal, claimant contends the commission erred in denying his request for temporary partial disability benefits on the ground that he failed to prove he adequately marketed his residual work capacity. He argues that the fact that he promptly registered with the employment commission after his light duty position with employer ended, followed up on all of the job leads provided by the employment commission, applied for all three of the jobs that were within his work restrictions, and took the first and only job that was offered amply demonstrated that he adequately marketed his residual work capacity. Thus, he concludes, the commission's decision that he "did not provide sufficient evidence of marketing should be reversed as there is no credible evidence to support the [c]ommission's finding." We disagree.

A partially disabled employee "who seeks compensation of the wage differential between his new and his old jobs, has the burden of proving that he has made a reasonable effort to market his full remaining work capacity." Nat'l Linen Serv. v. McGuinn, 8 Va. App. 267, 270, 380 S.E.2d 31, 33 (1989). "What constitutes a reasonable marketing effort depends upon the facts and circumstances of each case." The Greif Companies v. Sipe, 16 Va. App. 709, 715, 434 S.E.2d 314, 318 (1993). Indeed, "[w]hat is reasonable in one area, or in one industry, or even in one season might not be reasonable in another. The employee must obviously exercise reasonable diligence in seeking employment, and what is reasonable in a given case will depend upon all of the facts and surrounding circumstances." Great Atl. & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 467, 359 S.E.2d 98, 102 (1987).

> [I]n deciding whether a partially disabled employee has made reasonable effort to find suitable employment commensurate with his abilities, the commission should consider such factors as: (1) the nature and extent of employee's disability; (2) the

employee's training, age, experience, and education; (3) the nature and extent of employee's job search; (4) the employee's intent in conducting his job search; (5) the availability of jobs in the area suitable for the employee, considering his disability; and (6) any other matter affecting employee's capacity to find suitable employment. The commission, of course, determines which of these or other factors are more or less significant with regard to the particular case.

Nat'l Linen Serv., 8 Va. App. at 272-73, 380 S.E.2d at 34-35 (footnotes omitted). "The determination of whether a partially disabled employee has adequately marketed his residual work capacity lies within the fact-finding judgment of the commission, and its decision on that question, if supported by credible evidence, will not be disturbed on appeal." Wall Street Deli, Inc. v. O'Brien, 32 Va. App. 217, 220-21, 527 S.E.2d 451, 453 (2000).

"On appeal, we view the evidence in the light most favorable to [employer], the prevailing party before the commission" on this issue. Allen v. Southern Commercial Repair, Inc., 40 Va. App. 116, 121, 578 S.E.2d 64, 67 (2003). So viewed, we conclude the record supports the commission's finding that claimant failed to prove he made a reasonable effort to market his full residual work capacity. Although claimant offered evidence to show he was unable to continue in the same line of work he performed for employer as a utility mechanic due to his physical limitations and the work restrictions imposed by Dr. DiStasio, he offered no evidence showing that the part-time position he obtained as a van driver, which paid less than one third of his pre-injury average weekly wage of $860.40, accurately reflected his full residual earning capacity. As the deputy commissioner pointed out, "[i]t may be that . . . claimant ha[d] no useful transferable skill" that would enable him to obtain employment paying more than a minimal hourly wage, but the evidence he presented relative to the factors set forth in National Linen Service failed to prove that was the case.

The record established that claimant registered with the employment commission shortly after his job with employer ended on June 1, 2005, and that he pursued each of the four job leads

- 11 -

provided by the employment commission. Only the position of van driver was offered to him. He accepted that job and started working on August 15, 2005. However, claimant produced no evidence of any other efforts on his part to obtain employment during that period. Nor did he produce any evidence regarding his marketable skills or the availability in the area of jobs commensurate with his experience, training, education, and physical capabilities. The record further established that claimant completely discontinued his job search after obtaining the van driver position and, thus, made no effort to obtain a full-time, higher-paying job. Claimant presented no evidence explaining why he failed to seek more lucrative employment or showing that such employment was unavailable to him "either due to his injury or because no such work was available in the community." Nat'l Linen Serv., 8 Va. App. at 271, 380 S.E.2d at 34. Accordingly, the commission could properly find, based on the evidence before it, that claimant failed to prove he adequately marketed his full residual work capacity.

Nevertheless, claimant urges us to fashion a per se rule that the mere fact that an employee registers with the employment commission, follows up on every job lead provided by the employment commission, and takes the first job he is offered is sufficient, as a matter of law, to prove he made a reasonable effort to market his full residual work capacity. We decline to do so.

In National Linen Service, we held that "the mere fact that the employee obtained a new job, where the pay is substantially less than that received at the old job, is, standing alone, insufficient proof of making a reasonable effort to market one's remaining work capacity." 8 Va. App. at 268, 380 S.E.2d at 32. In Wall Street Deli, Inc., we held that evidence that the employee made no effort after obtaining a part-time, low-paying job to obtain more lucrative employment consistent with his capabilities, along with the employee's failure to produce evidence regarding the lack of availability of such employment in his area, "establish[ed] an

- 12 -

absence of effort on his part" to market his full residual work capacity. 32 Va. App. at 221, 527 S.E.2d at 453. Consistent with these decisions, we cannot say that the evidence presented in this case is sufficient, as a matter of law, to prove claimant made a reasonable effort to market his full residual work capacity. Simply registering with the employment commission and pursuing the job listings provided by that agency are not, under the circumstances of this case, sufficient, by themselves, to demonstrate that claimant made a reasonable effort to market his full residual work capacity. Given the large disparity between the wages he earned in the part-time job as a van driver and those he earned in his pre-injury job, claimant had to establish that he made a reasonable effort, after accepting the part-time job, to obtain more lucrative employment or show that such employment was not available in the community or beyond his skills and work restrictions.

Because the record contains credible evidence to support the commission's finding that claimant failed to carry his burden of proving he made a reasonable effort to market his full residual work capacity, we hold the commission did not err in denying claimant's request for temporary partial disability benefits on that ground.

IV.  CONCLUSION

For these reasons, we affirm the judgment of the commission.

<u>Affirmed.</u>